# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

|  |  |
|---|---|
| ROBERT E. LEE SUPINGER, JR., <br> *Plaintiff,* <br><br> v. <br><br> COMMONWEALTH OF VIRGINIA, *ET AL.*, <br> *Defendants.* | CASE NO. 6:15-cv-00017 <br><br> <u>MEMORANDUM OPINION</u> <br><br> JUDGE NORMAN K. MOON |

   This matter is before the Court on Defendants' motion to dismiss Plaintiff's amended complaint, which contains thirteen causes of action against multiple defendants.[1] For the following reasons, Defendants' motion will be granted in part and denied in part.

## I.    BACKGROUND

   Plaintiff Robert Supinger, a Caucasian male, was the Assistant Special Agent in Charge ("ASAC") of the Lynchburg Department of Motor Vehicles' Law Enforcement Services Office ("LES"). In 2010 and for much of 2011, Supinger was the highest-ranking law enforcement officer stationed onsite in the Lynchburg LES. Supinger grew increasingly concerned about the conduct of Jennifer Dawson, a Program Support Technician in the Lynchburg LES. Supinger concluded that Dawson suffered from "serious mental health issues," and believed that her job conduct was unsatisfactory, disruptive, and possibly dangerous.[2] Docket No. 23, at ¶ 22.

---

[1] Plaintiff asserts various claims against the Commonwealth of Virginia; the Virginia Department of Motor Vehicles ("DMV"); Richard Holcomb, Commissioner of DMV; Joseph Hill, Assistant Commissioner of DMV; Jeannie Thorpe, Human Resources Director of DMV; Donald Boswell, Law Enforcement Director of DMV; and Tom Penny, Director of DMV's Fuels Tax Enforcement Division.

[2] Among other things, Dawson allegedly: yelled and screamed at persons on the telephone; threw items in the office; threw items at agents; cried uncontrollably; ran from the office in distress; hid under her desk when alone in the office; turned off all of the office lights during the workday; and illegally possessed a weapon on DMV property.

Supinger reported his concerns to David Stultz, the Special Agent in Charge ("SAC") of the Lynchburg LES. Stultz was unable to address Dawson's behavior, however, because Holcomb, Hill, Thorpe, and Boswell prohibited him from taking any action.

Dawson took medical leave on March 12, 2012. Upset that nothing was done to address Dawson's behavior, Supinger endeavored to apprise various individuals and elected officials about his grievances.[3] Supinger alleges that, because he spoke out about the problems he observed in the office, Defendants discriminated and retaliated against him.

For instance, Supinger and other law enforcement officers spoke to Holcomb on March 15, 2012, about Dawson's emotional and mental condition, her threat to public safety, and her interference with the effective and efficient operation of the office. Boswell informed Supinger the day after the meeting that he would be transferred from Lynchburg to Waynesboro. Boswell told Supinger he was being transferred in order to comply with DMV's nepotism policy, as Supinger and his wife worked in the same building. Supinger and his wife had, however, worked at DMV in the same building for over 12 years. Moreover, Supinger learned that several other persons worked for DMV in the same office as their spouse, but only Supinger and his wife, who are an interracial couple, were subject to an involuntary transfer under DMV's nepotism policy.

The transfer to Waynesboro required Supinger to travel 1.5 hours to work each way, far greater than the 15-minute drive Supinger enjoyed to the Lynchburg office. Supinger also claims that the transfer negatively affected his employment responsibilities. After unsuccessfully challenging the transfer through DMV's internal appeals process, Supinger filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that the transfer was discriminatory.

---

[3] Supinger contacted, among others: Tim Sadler, Audit Manager with the Division of State Internal Audit; Boswell; Hill; Holcomb; then-Governor Robert McDonnell; State Senator Steve Newman; State Senator John Edwards; and State Senator R. Creigh Deeds.

Tim Sadler met with Supinger on April 6, 2012, regarding complaints he filed with Virginia's Fraud, Waste, and Abuse Hotline ("the Hotline"). Three days after Supinger's meeting with Sadler, Boswell, with the assistance of Hill and Thorpe, drafted a letter alleging that Supinger violated DMV's workplace harassment policy. Supinger filed a grievance on April 14, 2012, alleging that Boswell's letter was issued in retaliation for reporting to the Hotline.

Later that month on April 27, Supinger and several other law enforcement officers went to the office of State Senator Steve Newman to discuss their concerns. After the officers explained the purpose of their visit, Senator Newman ordered all of them to leave his office except for Stultz. Senator Newman notified several of the defendants of the April 27th meeting, and Boswell, at the direction of Holcomb and Hill, "chastised" Supinger for speaking with Senator Newman. *Id.* at ¶ 61. Boswell forbade Supinger from talking to persons outside the DMV, and especially not to elected officials, about Dawson. Supinger later learned that Senator Newman had, prior to the April 27 meeting, "intervened on Dawson's behalf and spoken with one or more of the Defendants about the circumstances then existing in the Lynchburg LES office." *Id.* at ¶ 59.

Hill and Boswell announced on May 11, 2012, that Dawson was returning to work from her medical leave, and instructed the agents to be professional towards her. Because it was apparent that no action would be taken against Dawson, Supinger again complained to the Hotline in May and June of 2012.

DMV announced in June 2012 that it would reorganize effective October 1, 2012. The reorganization would eliminate the Appomattox Division, the division at which Supinger was ASAC. DMV announced initially that Supinger would become ASAC in the Roanoke District. In August 2012, however, DMV decided that Supinger would be transferred to a separate DMV

work unit, the Fuels Tax Enforcement Division. Moreover, a female with less seniority in law enforcement, fewer years of employment at DMV, and less experience as ASAC would become the ASAC in the Roanoke District.

Supinger unsuccessfully challenged his transfer to the Fuels Tax Enforcement Division. Defendants told Supinger that he was transferred, rather than the less senior and less experienced female ASAC, because she was a female with children, and Defendants did not want her out late at night and far away from home.

Later that year, the tension in the Lynchburg DMV office came to a head when Dawson allegedly assaulted Anastasia Wootten, a Senior Special Agent ("SSA") at the Lynchburg LES on September 13, 2012. Stultz assigned Supinger to investigate the incident, and Supinger began gathering evidence. Because the Defendants took no action to address the incident, Wootten obtained a warrant accusing Dawson of assault and battery.

Boswell, Hill, Thorpe, and Holcomb were upset that Supinger did not prevent Wootten from obtaining a warrant, and on September 16, 2012, Boswell ordered Supinger to report to Richmond to be interviewed about the incident. On September 17, defendant Penny interviewed Supinger and implied that Supinger had committed some sort of misconduct by investigating the alleged assault.

Believing Penny's interview to be improper, Supinger complained to Virginia state senators and delegates on September 24. Boswell called Supinger on September 28 and suggested that Supinger's job was in jeopardy for contacting the elected officials.

Unperturbed by Boswell's call, Supinger continued to contact elected officials. Supinger contacted then-Governor Robert McDonnell on October 4, 2012. Supinger and other law enforcement officers met with State Senator Creigh Deeds on October 12 and discussed

Dawson's disruptive and dangerous work conduct, Defendants' refusal to remedy the situation, and the retaliation and discrimination Supinger had suffered by Defendants.

Defendants learned of Supinger's meeting with Senator Deeds, and they again warned him against discussing DMV matters with elected officials. Defendants also spoke with Stultz, who recounted the conversation to Supinger. Boswell allegedly told Stultz that talking to politicians about DMV matters was an "embarrassment" to Holcomb, and that Holcomb would be sure "others paid the price for this" and that he was "not going to be embarrassed or take any blame." Further, Boswell allegedly told Stultz that Holcomb was a "political survivor" and that he would blame the entire situation on Supinger, Stultz, and Wootten. *Id.* at ¶ 102–104.

Penny again interviewed Supinger on October 15, 2012. In addition to discussing Dawson's alleged assault on Wootten, Penny also questioned Supinger about the complaints he had made about Dawson and the Defendants to the Hotline and to elected officials.

Supinger believed the interrogations were intended to intimidate witnesses in Wooten's assault and battery case against Dawson, and so Supinger contacted the DMV Human Resources Office to request that Penny's interrogations end, though to no avail.

Later that month, Boswell reduced Supinger's annual evaluation rating from "Extraordinary Contributor" to "Contributor," and Supinger filed a grievance claiming his reduction in evaluation ranking was retaliatory.

Frustrated, Supinger again contacted Governor McDonnell on December 19, 2012. After learning that Supinger had contacted Governor McDonnell a second time, Hill, at the direction of Holcomb, accessed Supinger's driver's license records on file with the DMV. Hill then provided that information, including Supinger's photograph, to Capitol Police at the Virginia General Assembly Building and at the Governor's Mansion. Hill directed the police to "be on the look

out for Supinger" and to impede any attempt by Supinger to speak with elected officials. *Id.* at ¶ 120.

In late 2012, Supinger filed Charges of Discrimination with the EEOC relating to his two transfers, alleging that they were discriminatory. In January 2013, Supinger filed another Charge of Discrimination with the EEOC.

Supinger contacted Governor McDonnell for a third time on February 5, 2013. Defendants met with Supinger on February 12, 2013, and ordered him to report to Richmond where he was interrogated for a third time by defendant Penny. The interrogation lasted "several hours," and was ostensibly about the events that led to Wooten's assault and battery charge against Dawson. *Id.* at ¶ 127. Penny, however, questioned Supinger about his pending grievances, his EEOC charges, his cooperation with an investigation conducted by the State Inspector General, and his contact with elected officials. Supinger filed a Charge of Discrimination with the EEOC on February 26, 2013, alleging that the interrogations were retaliatory

On February 18, 2013—two days after Supinger filed his newest Charge of Discrimination—Hill suspended Supinger's employment with DMV.[4] Hill sent a letter to Supinger in March detailing the reasons for his suspension. Finally, Hill terminated Supinger's employment with DMV on April 9, 2013

Supinger attempted to appeal his termination, but Holcomb, Hill, and Thorpe refused Supinger a hearing. Supinger filed a Charge of Discrimination with the EEOC on January 1, 2014, relating to the termination of his employment.

---

[4] On March 2, 2013, Supinger filed a Charge of Discrimination with the EEOC relating to the suspension of his employment.

Supinger has searched for new employment, and has received job offers "conditioned upon receiving confirmation of certain aspects of his employment with DMV." *Id.* at ¶ 144. Supinger claims he has been unable to secure employment, however, because Holcomb, Hill, and Thorpe "intentionally misrepresented and/or failed to confirm Supinger's qualifications and experience." *Id.* at ¶ 145.

## II.    STANDARD OF REVIEW

When evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept as true all well-pleaded allegations. *See Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 539 (4th Cir. 2013); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotation marks omitted). Stated differently, in order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

## III.    DISCUSSION

### A.    TITLE VII NATIONAL ORIGIN AND RACIAL DISCRIMINATION

Plaintiff alleges that the Commonwealth and the DMV violated Title VII of the Civil Rights Act of 1964 ("Title VII") by discriminatorily transferring him from the Lynchburg office to the Waynesboro office. Boswell told Supinger that the reason for the transfer was to comply with DMV's nepotism policy, as Supinger and his wife, who is Korean, worked in the same

building. Supinger's wife had, however, worked in the same office as Supinger for over twelve years prior to his transfer. Supinger alleges that the nepotism policy was applied to only him and his wife on account of their interracial marriage; no other interracial couples were transferred under the nepotism policy.

Title VII prohibits discrimination on the basis of national origin, race, and sex in the terms and conditions of employment. 42 U.S.C. § 2000e-2(a). To prevail on a Title VII discrimination claim, Plaintiff must show that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) at the time of the adverse employment action, he was performing up to his employer's expectations; and (4) similarly situated employees who are not members of the protected class received more favorable treatment. *Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir. 2005).

The parties dispute only whether Supinger has pled facts that show he experienced an adverse employment action. An adverse employment action is a discriminatory act that "adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004).

Conduct short of firing or refusal to hire can constitute an adverse employment action. For example, "undesirable reassignment" can sometimes suffice. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 745 (1998). The Fourth Circuit has cautioned, however, that "reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect." *James*, 368 F.3d at 376 (quoting *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999)). "[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if

- 8 -

the new job does cause some modest stress not present in the old position." *Boone*, 178 F.3d at 256–57.

Supinger argues that his increased commute time to the Waynesboro office constitutes an adverse employment action. The transfer required Supinger to make a three hour roundtrip to Waynesboro, an amount far greater than his 30-minute roundtrip to the Lynchburg office. Docket No. 23, at ¶ 37. While the Fourth Circuit has said that "incurring small, additional commuting expenses is not the type of adverse employment action that is cognizable under Title VII," *Jensen-Graf v. Chesapeake Emp'rs' Ins. Co.*, No. 14–2081, 2015 WL 3916783, at *2 (4th Cir. June 26, 2015), Supinger's commute increased substantially—from thirty minutes roundtrip to three hours roundtrip. The inconvenience and expense caused by such a lengthy increase in commute time is sufficient to cause a significant detrimental effect on the terms and conditions of Supinger's employment with DMV. Accordingly, I find that Supinger's transfer to Waynesboro constitutes an adverse employment action under Title VII.[5] Defendants' motion to dismiss Plaintiff's Title VII national origin and racial discrimination claim will therefore be denied.

B. TITLE VII GENDER DISCRIMINATION

Supinger claims that the Commonwealth and the DMV's decision to transfer him to the Fuels Tax Enforcement Division amounts to unlawful gender discrimination under Title VII. Although Supinger was initially to remain the ASAC of the Roanoke District, the DMV ultimately gave the position to a female employee. DMV made the decision to appoint a female rather than Supinger precisely "because she was a female with children and Defendants did not want her out late at night and far from home . . . ." Docket No. 23, at ¶ 77.

---

[5] Alternatively, Supinger argues that his transfer constitutes an adverse employment action because it had the effect of a demotion. Because I find that Supinger's increased commute is sufficient to establish an adverse employment action under Title VII, I will not address Supinger's alternative argument.

Again, the parties dispute only whether the transfer to the Fuels Tax Enforcement Division constitutes an adverse employment action. Supinger does not allege he experienced a significant increase in commute time. Rather, he alleges that the transfer is an adverse employment action for the following reasons. First, the transfer "would cause Supinger to lose his opportunity for advancement in DMV law enforcement." Docket No. 23, at ¶ 73. Second, the transfer "would require Supinger to travel extensively and [would] require a substantial amount of work outside of normal business hours, which was a significant deviation from Supinger's then-present assignment at DMV." *Id.* at ¶ 74. Third and finally, the transfer "would place Supinger under the direct supervision of SAC William Bralley [who] had a close business and personal relationship with PST Jennifer Dawson, and Bralley would act to protect and defendant Dawson." *Id.* at ¶ 75.

While reassignment to a job that decreases a plaintiff's "opportunity for promotion" can be an adverse employment action, *see Boone*, 178 F.3d at 256–57, Supinger has not pled with any specificity how the transfer would deny him opportunity for promotion. Supinger's complaint states only that the Fuels Tax Enforcement Division is "a much smaller section within DMV." Docket No. 23, at ¶ 73. This threadbare assertion is not enough. "While a complaint . . . does not need detailed factual allegations," *Twombly*, 550 U.S. at 555, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678.

Moreover, the transfer does not count as an adverse employment action merely because it would require Supinger to work substantially outside of normal business hours or occasionally travel. Supinger's Employee Work Profile ("EWP")[6] already required him to be "[w]illing to

---

[6] Defendants seek to rely on Plaintiff's EWP, despite the fact that Plaintiff did not attach his EWP to his Complaint. Defendants have attached the EWP to their motion to dismiss. "When a defendant attaches a document to its motion

work irregular hours, travel overnight, and endure personal risks." Docket No. 36, Ex. A, at 2. A transfer that requires plaintiff to engage in work "consistent with preexisting responsibilities" does not constitute an adverse employment action. *See James*, 368 F.3d at 372. Thus, because Supinger was required to merely do his preexisting job duties, even if at a ratio higher than in Lynchburg, the transfer did not "adversely affect the terms, conditions, or benefits of the plaintiff's employment." *Id.* at 375.

Finally, Supinger has failed to articulate why working under the direct supervision of William Bralley would amount to a "significant detriment." Rather, that Supinger may have to work under a supervisor he does not like amounts to nothing more than his "subjective dissatisfiaction with [his job] and is not actionable . . . ." *Gordon v. Guiterrez*, No. 1:06cv00861, 2007 WL 30324, at *8 (E.D. Va. Jan. 4, 2007). For the above reasons, Defendants' motion to dismiss Plaintiff's Title VII gender discrimination claim will be granted.

## C. TITLE VII RETALIATION

Supinger claims that the Commonwealth and the DMV retaliated against him in violation of Title VII because he engaged in protected activity. In particular, Supinger alleges that the DMV retaliated against him by: (1) transferring him to the Fuels Tax Enforcement Division; (2) repeatedly interrogating him; (3) "violati[ng] [his] rights under the Constitution of the United States of America and the Code of Virginia"; (4) distributing his photograph to Capitol Police; and (5) suspending and terminating his employment with DMV. Docket No. 23, at ¶ 164.

---

to dismiss, 'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'" *Am. Chiropractic v. Trigon Healthcare*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)) (alteration in original). In *Trigon*, the court considered a plaintiff's professional services agreement because the plaintiff "explicitly referred to the [services agreement], and its [claims were] based on the alleged misrepresentation made in that document." *Id.* at 234. Likewise here, Plaintiff has explicitly referenced his EWP in his Complaint and uses his EWP to show that he experienced a reduction in responsibilities and therefore an adverse employment action. Moreover, there is no indication that Plaintiff challenges the validity of the EWP. For those reasons, I will consider Plaintiff's EWP.

A *prima facie* case of Title VII retaliation requires the plaintiff to allege that: (1) he engaged in protected activity; (2) his employer took a materially adverse action against him; and (3) but for the protected activity, the asserted adverse action would not have occurred. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015).

### 1. Materially Adverse Action

Defendants concede, as they must, that suspending and terminating Supinger's employment constitutes a materially adverse action. They dispute, however, that the Defendants' other allegedly retaliatory conduct constitutes materially adverse action.

To prevail on a Title VII retaliation claim, a plaintiff "need not show an 'adverse employment action defined as a materially adverse change in the terms and conditions of employment.'"[7] *Caldwell v. Johnson*, 289 Fed. Appx. 579, 588 (4th Cir. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006)). Rather, in the context of a retaliation claim, a materially adverse action is an action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Wells v. Gates*, 336 Fed. Appx. 378, 383 (4th Cir. 2009) (quoting *White*, 548 U.S. at 68). An action is not materially adverse if it amounts to "petty slights or minor annoyances that often take place at work and that all employees experience." *White*, 548 U.S. at 68.

#### a. Violation of Constitutional and Virginia State Law Rights

Supinger's claim that Defendants retaliated against him by "violati[ng] [his] rights under the Constitution of the United States of America and the Code of Virginia," Docket No. 23, at ¶ 164, fails because it is a legal conclusion. It is well established that "courts are not bound to

---

[7] In other words, Plaintiff need not, unlike in his Title VII *discrimination* claims, show that the action "adversely affect[ed] the terms, conditions, or benefits of the plaintiff's employment." *Compare James*, F.3d at 375.

accept as true a legal conclusion couched as a factual allegation." *See Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted).

b.  Repeated Interrogations

"[I]nterrogations alone are insufficient as a matter of law to establish an adverse employment action." *Lyman v. NYS OASAS*, 928 F. Supp. 2d 509, 520–21 (N.D.N.Y. 2013); *see also Ren Yuan Deng v. New York State Office of Mental Health*, No. 13 Civ. 6801(ALC), 2015 WL 221046, at *9 (S.D.N.Y. Jan. 15, 2015) (affirming that employer interrogations are not materially adverse actions). DMV's repeated interrogations of Supinger, most of which were about subjects unrelated to his Title VII complaints, would not deter a reasonable employee from engaging in protected activity. Such interrogations are a normal and expected aspect of employment.

c.  Distribution of Supinger's Photograph to Capitol Police

Supinger alleges that Defendants' "distribution of his photograph to Capitol police . . . [is] materially adverse . . . ." Docket No. 23, at ¶ 164. A reasonable worker might be dissuaded from engaging in protected activity if they knew their employer had distributed their photograph to Capitol Police. Supinger has not, however, pled facts showing that he was either aware that Capitol Police had his photograph, or that Capitol Police actually impeded any attempt by Supinger to speak with elected officials. Indeed, DMV accessed Supinger's photograph sometime after December 19, 2012. The Court will assume the photograph was distributed to Capitol Police soon thereafter. Supinger nevertheless continued to contact elected officials. For instance, he contacted Governor McDonnell on February 5, 2013.[8]

---

[8] Although Supinger's complaint states that he contacted Governor McDonnell on February 5, 2012, the Court assumes Supinger meant February 5, 2013. Plaintiff's complaint otherwise flows chronologically, and the surrounding paragraphs refer to February 2013.

Because Supinger has pled nothing to suggest he was aware his photograph was distributed to Capitol Police or that Capitol Police actually attempted to restrict his access to elected officials, I conclude that merely distributing the photo, without more, does not constitute a materially adverse action.

## 2. Causation

Even if Plaintiff can successfully show that he engaged in a protected activity and that his employer took a materially adverse action against him, he must still allege facts showing a causal connection between his protected activity and the materially adverse action. "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . [which] requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). In other words, "[t]o prove a causal connection, [Plaintiff] must be able to show that [Defendants] fired him 'because the plaintiff engaged in a protected activity.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007) (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).

"Because causation can be difficult to prove, a plaintiff may raise a presumption of causation by showing that the employer had knowledge of the protected activity and that the adverse action occurred soon thereafter." *Vance v. Chao*, 496 F. Supp. 2d 182, 186 (D.D.C. 2007) (citing *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)). While "[t]here ordinarily must 'be some degree of temporal proximity' between the protected activity and the retaliatory conduct," *Rigg v. Urana*, No. 1:14cv1093, 2015 WL 3904993, at *3 (M.D.N.C. June 25, 2015) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005)), "when time between the two events is short, an inference of causation arises." *Rigg*, 2015

WL 3904993, at *3. "[A] gap of three to four months of temporal proximity has been held insufficient, standing alone, to establish causation." *Id.* at *3 (citing *Shields v. Fed. Express Corp.*, 120 Fed. Appx. 956, 963 (4th Cir. 2005)).

### a. Suspension and Termination of Supinger's Employment

Supinger has established a *prima facie* case of Title VII retaliation with regard to his claim that DMV suspended and terminated his employment because he engaged in protected activity. Suspension and termination of employment unquestionably qualify as materially adverse action. *See White*, 548 U.S. at 52–53. Plaintiff has alleged that he engaged in protected activity, to wit, that he made several charges of discrimination and utilized informal grievance procedures to allege discrimination.[9] *See Laughlin*, 149 F.3d at 259.

Causation has been sufficiently alleged. DMV learned about his EEOC charges "in October 2012, and again in January 2013." Docket No. 23, at ¶ 123. Supinger was suspended on February 28, 2013, and ultimately terminated on April 9, 2013. Docket No. 23, at ¶¶ 133, 137. A presumption of causation is established where, as here, plaintiff alleges "that the employer had knowledge of the protected activity and that the adverse action occurred soon thereafter." *Vance*, 496 F. Supp. 2d at 186. Defendants' motion to dismiss with regard to Plaintiff's claim that DMV suspended and terminated his employment for engaging in protected activity is therefore denied.

### 3. Title VII Protected Activity

Supinger must also show he suffered a materially adverse action because he "engaged in *protected activity*." *See Foster*, 787 F.3d at 250 (emphasis added). This phrase is key. "Protected activity" under Title VII is narrowly defined: Title VII makes it unlawful to retaliate against an employee because the employee "opposed any [discriminatory practice under Title VII], or

---

[9] Plaintiff's complaint contains at least seven instances where Supinger either filed a formal Charge of Discrimination with the EEOC or utilized informal grievance procedures to complain of discriminatory conduct. *See* Docket No. 23, at ¶¶ 49, 78, 122, 125, 132, 134, 142.

because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3. In other words, "[a]n employer may not retaliate against an employee for participating[10] in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing[11] discriminatory practices in the workplace." *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

   a. DMV's Transfer of Supinger to the Fuels Tax Enforcement Division

   Even assuming it constitutes materially adverse action, Supinger has failed to allege he was transferred to the Fuels Tax Enforcement Division because he engaged in Title VII protected activity. Supinger's complaint states that the decision to transfer Supinger to the Fuels Tax Enforcement Division was made, or at least announced, "in late August 2012." Docket No. 23, at ¶ 71. The DMV did not have knowledge that Supinger engaged in Title VII protected activity, however, until October 2012. *See* Docket No. 23, at ¶ 123 ("DMV learned of the filing of ASAC Supinger's Charges of Discrimination in October 2012, and again in January 2013."). Because the retaliatory conduct occurred before the DMV had knowledge of his Title VII protected activities, Supinger has failed to allege that he was transferred because he engaged in Title VII protected activity. Defendants' motion to dismiss with regard to Supinger's claim that DMV transferred him to the Fuels Tax Enforcement Division for engaging in protected activity is accordingly granted.

---

[10] Activities that constitute participation include: (1) making a charge of discrimination; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII. *Laughlin*, 149 F.3d at 259.

[11] Activities that constitute opposition "encompass[] utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Id.* at 259. "Oppositional activity must be directed to 'an unlawful employment practice' under Title VII." *DeMasters v. Carilion Clinic*, 296 F.3d 409, 417 (4th Cir. 2015) (quoting 42 U.S.C. § 2000e-3(a)).

a. DMV's Transfer to Waynesboro and Accusatory DMV Letter

Supinger alleges that his transfer to Waynesboro constitutes retaliatory action. Moreover, Supinger claims that the "Defendants drafted an allegation letter falsely accusing Supinger of violating the Workplace Harassment policy and Standards of Conduct," and that this also constitutes retaliatory conduct under Title VII. *See* Docket No. 35, at ¶ 13. Even assuming the transfer and the letter constitute materially adverse action, Supinger has failed to allege that he was retaliated against because he engaged in Title VII protected activity.

Supinger states that "[o]n March 15, 2012, [he] and others met with Holcomb and raised concerns regarding *public and workplace safety*." *Id.* (emphasis added). "The next day, Defendants told Supinger that DMV was transferring him to Waynesboro pursuant to the "nepotism policy." *Id.* Complaints of an employee's threat to "public and workplace safety" is not Title VII activity, because it does not "participat[e] in an ongoing investigation or proceeding under Title VII . . . [or] oppos[e] discriminatory practices in the workplace." *Accord Laughlin*, 149 F.3d at 259. Rather, they are merely generalized grievances about the workplace, and are not protected by Title VII. For that reason, Supinger has failed to allege that he was transferred because he engaged in protected activity under Title VII.

Supinger also states that "[o]n Friday, April 6, 2012, [he] spoke with State Internal Audit Manager Tim Sadler regarding his complaints lodged with [Virginia's Fraud, Waste, and Abuse Hotline]." *Id.* "On Monday, April 9, 2012, Defendants drafted an allegation letter falsely accusing Supinger of violating the Workplace Harassment policy and Standards of Conduct." *Id.* Supinger complained to the FWA about: (1) Dawson's behavior and how it constituted a threat to public safety; and (2) Hill's violation of state policy by accepting a gift from Dawson. Docket No. 23, at ¶ 29–30. Supinger's complaints to the FWA about Dawson's threat to public safety

and Hill's violation of state policy prohibiting gifts is not about protected activity under Title VII, as it does not consist of either filing a Title VII charge of discrimination or informally opposing Title VII discrimination. Supinger has therefore again failed to allege that Defendants drafted the letter because he engaged in protected activity under Title VII.

    4.  <u>Summary</u>

For the above reasons, Supinger has alleged a *prima facie* case of Title VII retaliation only with regard to his claim that he was suspended and terminated because he filed Charges of Discrimination with the EEOC and utilized DMV's informal grievance procedures to complain about DMV's Title VII violations. All of Supinger's other Title VII retaliation theories fail to state a valid cause of action, and will be dismissed.

### D.   FREE SPEECH RETALIATION

Supinger claims that Holcomb, Hill, Thorpe, Boswell, and Penny[12] retaliated against him because, *inter alia*, he "petitioned and spoke to elected representatives . . . ." Docket No. 23, at ¶ 171–72.

To state a First Amendment retaliation claim, Plaintiff must allege that: (1) he spoke as a citizen about a matter of public concern, rather than about a matter of personal interest: (2) the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) the employee's speech was a substantial factor in the employer's termination decision. *McVey v. Stacy*, 157 F.3d 271, 277–78 (4th Cir. 1998).

The parties' principal dispute is whether Supinger's speech was about a matter of public concern. Speech is about a matter of public concern "when it involves an issue of social,

---

[12] Supinger has withdrawn his claim of free speech retaliation against the Commonwealth and the DMV. *See* Docket No. 35, at 14 ("Plaintiff concedes that the Commonwealth and DMV should be dismissed as to Count IV: they cannot be properly included in this § 1983 claim . . . ."

political, or other interest to a community." *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004). It is important to distinguish speech about social or political issues from speech about "matters of internal policy, including mere allegations of favoritism, employment rumors, and other complaints of interpersonal discord." *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 352 (4th Cir. 2000). Speech about "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee." *Stroman v. Colleton County Sch. Dist.*, 981 F.2d 152, 156 (4th Cir. 1992).

"[I]t [is] clearly established in the law of this Circuit . . . that an employee's speech about serious governmental misconduct, and certainly not least of all serious misconduct in a law enforcement agency, is protected." *Hunter v. Town of Mocksville*, 789 F.3d 389, 394 (4th Cir. 2015) (quoting *Durham v. Jones*, 737 F.3d 291, 303–04 (4th Cir. 2013)). In *Hunter*, for instance, the Fourth Circuit held that speech detailing that the chief of police "embezzled funds, had a drinking problem, and masqueraded as a certified officer with powers . . . even though he was only an administrative chief without the authority to do so," was certainly about matters of public concern. *Hunter*, 789 F.3d at 394, 402.

Ultimately, whether speech addresses a matter of public concern "must be determined by the content, form, and context of a given statement . . . ." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). Because the speech's "content, subject-matter is always the central aspect" of the inquiry, *Arvinger v. Mayor & City Council of Baltimore*, 862 F.2d 75, 79 (4th Cir. 1988) (citation omitted), the Court must "analyze carefully the exact language" of the employee's

speech "in order to determine whether it qualifies as a matter of 'public interest' beyond 'a most limited sense.'" *Jurgensen v. Fairfax County, Va.*, 745 F.2d 868, 880 (4th Cir. 1984).

### 1. Contact with Governor McDonnell

Supinger alleges that he met with Governor McDonnell three times. Specifically, Supinger alleges that: (1) "On October 4, 2012, Supinger contacted then Governor Bob McDonnell about the matters of public concern set forth herein," Docket No. 23, at ¶ 97; (2) "On December 19, 2012 Supinger contacted Governor McDonnell again regarding the matters of public concern alleged herein," *id.* at ¶ 117; and (3) "On February 5, 2012, Supinger contacted Governor McDonnell again regarding the matters of public concern alleged herein," *id.* at ¶ 126.

These are nothing more than "[t]hreadbare recitals of the elements of a cause of action [here, "matters of public concern"], supported by mere conclusory statements . . . ." *Iqbal*, 556 U.S. at 678. "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Supinger has not provided the Court with any facts on which it can evaluate whether Supinger's conversation with Governor McDonnell was about a matter of public concern. Accordingly, Supinger's First Amendment retaliation claim as to his conversations with Governor McDonnell will be dismissed.

### 2. April 27th Contact with Senator Newman and September 24th Contact with Virginia Representatives

Supinger alleges that "on April 27, 2012, Supinger and other law enforcement officers went to the office of State Senator Steve Newman to discuss their concerns [about fraud, waste and/or abuse] with him." Docket No. 23, at ¶ 56. Supinger also alleges that "[o]n September 24, 2012, Supinger contacted Virginia State Senators and Delegates regarding matters of public concern, such as evidence of impropriety on the part of government officials as well as

incidences of fraud and gross mismanagement." *Id.* at ¶ 92. While speech that the government engaged in fraud and gross mismanagement could be a matter of public concern, *see, e.g.*, *Hunter*, 789 F.3d at 394 ("[E]mployee's speech about serious governmental misconduct . . . is protected."), Supinger has provided nothing more than "conclusory statements without reference to its factual context." *See Iqbal*, 556 U.S. at 686.

Supinger has concluded that his speech was about government impropriety, waste, fraud, and mismanagement. He has not, however, provided any further factual enhancement to support that conclusion. Supinger has not, for instance, provided even a rough summary or paraphrase of what he actually said to the Virginia representatives or to Senator Newman; nor has he specified of what the government impropriety, fraud, waste, and mismanagement consisted. Supinger's threadbare complaint distinguishes our case from *Hunter*, where the plaintiff spoke to the media about *specific* government misconduct, to wit, how the Chief of Police "embezzled funds, had a drinking problem, and masqueraded as a certified officer with powers . . . even though he was only an administrative chief without the authority to do so." 789 F.3d at 394. Thus, the plaintiff spoke not only of broad governmental misconduct, but about specific instances of governmental misconduct.

Plaintiff's complaint, by contrast, consists of nothing but "labels and conclusions," which the Court need not accept. *See Iqbal*, 556 U.S. at 678. Because Supinger's complaint is framed at such a broad level of abstraction, it is impossible for the Court to determine whether his speech was about a matter of public concern. Accordingly, Supinger's First Amendment retaliation claim as to his April 27, 2012, conversation with Senator Newman, and his September 24, 2012, conversation with Virginia representatives, will be dismissed.

### 3. October 12th Meeting with Senator Creigh Deeds

Supinger alleges that "[o]n October 12, 2012, Supinger and other law enforcement officers met with State Senator Creigh Deeds to discuss the circumstances existing in the Lynchburg LES office." Docket No. 23, at ¶ 99. They discussed: (1) "[h]ow Dawson's activities were disrupting the orderly operation of the office resulting in a wasting of state resources in the form of manpower, and placed citizens and DMV employees at risk and in fear for their own safety"; (2) "[t]hat the Defendants had refused to do anything to address the situation"; and (3) "[r]etaliation and discrimination perpetrated against Supinger, and other law enforcement officers by Defendants." *Id.* I find that Supinger's speech was not about a matter of public concern.

Supinger's speech is principally about his dissatisfaction with "matters of internal policy, favoritism, and other employment-related matters." *See Goldstein*, 218 F.3d at 353. "As for [Supinger's] claims regarding 'workplace safety,' they concern not the public at large, but Plaintiff and [his] colleagues in the Lynchburg LES office." *See Wootten*, 2015 WL 1345276, at *12. Likewise, "[his] claims regarding 'waste' describe a generalized 'waste' of [his] and other employees' time, not the waste of specific public funds." *Id.* Although *Hunter* makes clear that speech about serious governmental misconduct is a matter of public concern, *see* 789 F.3d at 394, Supinger's dissatisfaction with DMV's handling of Dawson boils down to a complaint of favoritism extended to Dawson. Supinger's speech, therefore, was about nothing more than "matters of internal policy, including mere allegations of favoritism, employment rumors, and other complaints of interpersonal discord." *Goldstein*, 218 F.3d at 352. Supinger has therefore failed to plead a case of First Amendment retaliation. Accordingly, Defendants' motion to dismiss Supinger's First Amendment retaliation claim will be granted.

E. DEPRIVATION OF DUE PROCESS

Supinger alleges that Holcomb, Hill, Thorpe, and Penny[13] deprived him of due process in violation of the Fourteenth Amendment after he was fired by "refus[ing] to afford Supinger a hearing as required under the [Law Enforcement Officers Procedural Guarantees Act, or LEOPGA, Va. Code § 9.1500, *et seq.*,]. Docket No. 23, at ¶ 140.[14]

The due process clause of the Fourteenth Amendment provides that "no state shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV § 1. "[I]n order to claim entitlement to the protections of the due process clause—either substantive or procedural—a plaintiff must first show that he has a constitutionally protected 'liberty' or 'property' interest, and that he has been 'deprived' of that protected interest by some form of 'state action.'" *Stone v. Univ. of Md. Med. Sys. Corp.,* 855 F.2d 167, 172 (4th Cir. 1988) (internal citations omitted). If the plaintiff makes such a showing, the court considers what process was required and whether any process provided was adequate in the particular factual context. *Id.*

Plaintiff has sufficiently alleged a violation of procedural due process. Plaintiff had a property interest in his continued employment with DMV, and he was deprived of that property interest when he was suspended and terminated. LEOPGA provides that "[b]efore any dismissal, suspension without pay or transfer for punitive reasons may be imposed . . . [a] law enforcement officer may proceed under the . . . law-enforcement officer's procedural guarantees . . . ." Va. Code § 9.1-502. Plaintiff has plead that he "attempted to grieve his termination pursuant to the

---

[13] Plaintiff has withdrawn his claim against the Commonwealth and the DMV. *See* Docket No. 35, at 25 ("Plaintiff concedes that the Commonwealth and DMV should be dismissed as to Count IV, as they cannot be properly included in this § 1983 claim.").

[14] Supinger also claims he was denied due process when "Defendants did not advise [him] that he was under investigation or being considered for disciplinary or other punitive action when interrogated on three separate occasions." Docket No. 23, at ¶ 185. Supinger acknowledges, however, that the Defendants provided Supinger with "notice . . . [which] outlined the reasons why DMV was terminating his employment." *Id.* at ¶ 137. This is sufficient process. *See Riccio v. Cnty. of Fairfax*, 907 F.2d 1459, 1465 (4th Cir. 1990). Accordingly, Supinger's due process claim with regard to the theory that the DMV failed to provide him with notice of the charges against him will be dismissed.

LEOPGA, but [Defendants] have refused to afford Supinger a hearing as required under the LEOPGA." Docket No. 23, at ¶ 140. Plaintiff has thus alleged that the Defendants denied him due process of law. Defendants' motion to dismiss Plaintiff's due process claim will be denied.

F.  SUPERVISORY LIABILITY

Supinger alleges that "Defendant Holcomb exercised supervisory control over other Defendants, specifically Hill, Thorpe, Boswell, and Penny . . . [and] Holcomb conspired with these other Defendants to violate Supinger's constitutional rights, namely free speech and petition, and due process." Docket No. 23, at ¶ 193–94.

To prevail on a supervisory liability claim, Supinger must show that: (1) Holcomb had actual or constructive knowledge that his subordinates were engaged in conduct that posed a "pervasive and unreasonable risk" of constitutional injury to Supinger; (2) Holcomb's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) there was "an affirmative causal link" between Holcomb's inaction and the particular constitutional injury suffered by Supinger. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994); *see also Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014).

As discussed, *supra*, Supinger has not pled a violation of his First Amendment rights. Accordingly, his claim with regard to that theory will be dismissed. Supinger has, however, sufficiently pled a violation of post-termination due process rights. Supinger's complaint is therefore sufficient to state a claim for supervisory liability against Holcomb. Defendants' motion to dismiss Supinger's supervisory liability claim will accordingly be denied to the extent Supinger has sufficiently pled a violation of post-termination due process rights.

G.  SECTION 1981 AND 1983 RACIAL DISCRIMINATION

Supinger claims that Holcomb, Hill, Thorpe, and Boswell "discriminated against [him] on account of his marriage to a Korean, non-white female, [by] transferring him to Waynesboro and terminating his employment," Docket No. 23, at ¶ 207, in violation of 42 U.S.C. §§ 1981 and 1983. More specifically, Supinger alleges that "Boswell told Supinger that the reason for the transfer was in the spirit of compliance with DMV's nepotism policy because Supinger's wife worked in the same building as ASAC Supinger." Docket No. 23, at ¶ 35. Supinger later discovered "that several persons worked for DMV out of the same office but in different departments . . . but Supinger and his wife were the only mixed race/mixed national origin couple among this similarly situated group and were the only couple in which one of the spouses was involuntarily transferred purportedly due to DMV's nepotism policy." *Id.* at ¶ 41.

Title 42 U.S.C. § 1981 grants all persons within the jurisdiction of the United States "the same right . . . to make and enforce contracts . . . as is enjoyed by white persons." *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018–19 (4th Cir. 1999). Section 1983 is the "exclusive federal remedy for a violation of the rights guaranteed in § 1981." *Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995) (internal quotation marks and citation omitted). The elements of a *prima facie* case under § 1981 mirror the elements required to establish a *prima facie* case under Title VII. *See Ford v. GE Lighting, LLC*, 121 Fed. Appx. 1, 5 (4th Cir. 2005) (per curiam). Therefore, Supinger must allege that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) at the time of his employer's adverse action, he was performing up to his employer's expectations; and (4) similarly situated employees who are not members of the protected class received more favorable treatment. *Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir. 2005).

Supinger has sufficiently alleged that his transfer to Waynesboro violated §§ 1981 and 1983. For the reasons stated in Section III.A., *supra*, Supinger's transfer to Waynesboro was an "adverse employment action."Accordingly, Defendants' motion to dismiss Plaintiff's claim under §§ 1981 and 1983 will be denied.

H. VIOLATION OF GOVERNMENT DATA COLLECTION AND DISSEMINATION PRACTICES ACT AND VIOLATION OF THE DRIVER'S PRIVACY PROTECTION ACT

Supinger alleges that the Commonwealth, the DMV, Hill, and Hoclomb violated the Government Data Collection and Dissemination Practices Act (the "Data Act"), Va. Code § 2.2-3800, when Hill, "at the direction of Defendant Holcomb . . . obtained, used and disclosed the highly restricted personal information . . . of Supinger . . . to the Capitol Police at the General Assembly and to non-law enforcement personnel in the Governor's Mansion in Richmond, Virginia." Docket No. 23, at ¶ 213. The personal information included "Supinger's driver's license photograph, with instructions to the Capitol Police to be on the lookout for Supinger . . . ." *Id.* at ¶ 214. The Defendants obtained and disclosed Supinger's information "in an attempt to . . . prevent Supinger from contacting elected officials . . . ." *Id.* at ¶ 217.

Similarly, Supinger alleges that Hill and Holcomb violated the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721 *et seq.*, when "Hill obtained, used and disclosed Supinger's restricted and highly restricted personal information in an attempt to restrict Supinger's ability to exercise his rights under the First Amendment to the Constitution of the United States . . . ." Docket No. 23, at ¶ 230.

1. Driver's Privacy Protection Act

Under the DPPA, "[a] person who knowingly obtains, discloses, or uses personal information, from a motor vehicle record, for a purpose not permitted under [18 U.S.C. § 2721 *et seq.*] shall be liable to the individual to whom the information pertains, who may bring a civil

action in a United States district court." 18 U.S.C. § 2724. Such information may be disclosed "[f]or use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions." 18 U.S.C § 2721(b)(1). Such information may also be disclosed "[f]or any other use specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety." 18 U.S.C. § 2721(b)(14).

The "plaintiff bears the burden of showing that the obtainment, disclosure, or use of personal information from her motor vehicle records was not for a purpose enumerated in that section." *Wootten v. Virginia*, C.A. No. 6:14-cv-00013, 2015 WL 1345276, at *15 n.11 (W.D. Va. March 23, 2015).

The Western District of Virginia has thrice held that dissemination of an individual's photograph by the DMV to Capitol Police is a "permissible use" under the DPPA. *See Wootten*, 2015 WL 1345276, at *14 ("Hill's disclosure of Plaintiff's DMV information to the Capitol Police is a 'permissible use' under [DPPA]."); *Wootten v. Virginia*, No. 6:14–cv–00013, 2015 WL 1943274, at *3 (W.D. Va. April 29, 2015) ("[T]he disclosure of Plaintiff's DMV information to the Capitol Police is a 'permissible use' under the [DPPA]."); *Stultz v. Virginia Dept. of Motor Vehicles*, No. 7:13CV00589, 2015 WL 4648001, at *10 (W.D. Va. Aug. 5, 2015) ("[Plaintiff] has not sufficiently alleged that his DMV information was impermissibly disclosed to the Capitol Police."). Accordingly, Supinger has failed to adequately plead a violation under the DPPA. Defendants' motion to dismiss Supinger's DPPA claim will be granted.

2. <u>Government Data Collection and Dissemination Practices Act</u>

"The [Data Act] was enacted in response to concerns over potentially abusive information-gathering practices by the government, including enhanced availability of such personal information through technology." *Carraway v. Hill*, 574 S.E.2d 274, 276 (Va. 2003) (citing *Hinderliter v. Humphries*, 297 S.E.2d 684, 686 (Va. 1982)). "The Act does not make such personal information confidential but establishes certain practices which must be followed in the collection, retention, and dissemination of that information." *Id.* (citing *Hinderliter*, 297 S.E.2d at 686).

Although unclear from Supinger's complaint and his briefs, it appears that he is suing under subsection (A)(1) of Va. Code § 2.2-3803. That subsection provides:

> Any agency maintaining an information system that includes personal information shall:
>
> Collect, maintain, use, and disseminate only that personal information permitted or required by law to be so collected, maintained, used, or disseminated, or necessary to accomplish a proper purpose of the agency.

The Supreme Court of Virginia has made clear that "[t]here is a presumption that public officials will obey the law." *Hinderliter*, 297 S.E.2d at 689. Moreover, the Court has established that "the burden [is] on the plaintiff to establish a lack of necessity or an improper purpose for the dissemination." *Id.*

For the reasons stated *supra*, disclosure of Supinger's personal information to Capitol Police is a permitted use. Accordingly, Defendants' motion to dismiss Supinger's Virginia Data Act claim will be granted.

I. VIOLATION OF VIRGINIA'S FRAUD AND ABUSE WHISTLE BLOWER PROTECTION ACT

Supinger alleges that because he "complained to the Commonwealth's Fraud, Waste and Abuse Hotline ['the Hotline'] . . . [Holcomb, Hill, Thorpe, and Boswell] retaliated against

Supinger . . . [by] transferring Supinger twice and terminating his employment with DMV."[15] Docket No. 23, at ¶ 238–41. Supinger alleges that this conduct is in violation of Virginia's Fraud and Abuse Whistle Blower Protection Act ("Whistle Blower Act"), Va. Code § 2.2-3009 *et seq.*

The Whistle Blower Act provides that it is the "policy of the Commonwealth that . . . employees of state government be freely able to report instances of wrongdoing or abuse committed by state agencies or independent contractors of state agencies." Va. Code § 2.2-3009. In particular, "[n]o employer may discharge, threaten, or otherwise discriminate or retaliate against a whistle blower whether acting on his own or through a person acting on his behalf or under his direction." *Id.* at § 2.2-3011(A).

In order to be a whistle blower under the statute, the employee must report on "wrongdoing or abuse." *Id.* at 2.2-3010. Wrongdoing is defined as "a violation, which is not of a merely technical or minimal nature, of a federal or state law or regulation or a formally adopted code of conduct or ethics of a professional organization designed to protect the interests of the public or employee." *Id.* Abuse is defined as "an employer's or employee's conduct or omissions that result in a substantial misuse, destruction, waste, or loss of funds or resources belonging to or derived from federal, state, or local government sources." *Id.* No Virginia court has interpreted or construed this provision of the statute.

1. October 17th Complaint to the Hotline

Supinger complained to the Hotline on October 17, 2011, "regarding Dawson's behavior . . . ." Docket No. 23, at ¶ 29. Supinger does not specify of which behavior he complained. After surveying Supinger's complaint, the Court concludes that none of Dawson's behavior possibly complained of to the Hotline constitutes "wrongdoing" or "abuse" within the

---

[15] Plaintiff has withdrawn his claim against the Commonwealth and the DMV. *See* Docket No. 35, at 39 ("Plaintiff concedes that the Commonwealth and DMV should be dismissed as to Count X.").

meaning of the statute. Although Supinger alleges that Dawson illegally possessed a weapon on DMV property, Supinger later clarifies that Dawson possessed pepper spray. This violation of Virginia policy does not rise above a merely technical or minimal nature, and therefore is not a complaint of wrongdoing.

Likewise, the complaint does not allege abuse. None of Dawson's conduct resulted in a "substantial misuse, destruction, waste, or loss of funds or resources belonging to or derived from federal, state, or local government sources." Va. Code § 2.2-3010.

### 2. November 30th Complaint to the Hotline

Supinger complained to the Hotline on November 30, 2011, that "Defendant Hill accepted a gift from Dawson, in violation of state policy because Dawson is Hill's subordinate."Docket No. 23, at ¶ 30. Supinger has not specified what Hill accepted from Dawson or the value of the gift. Supinger's complaint with regard to this theory is accordingly dismissed.

### 3. May and June 2012 Complaints to the Hotline

In May and June 2012, Supinger "again complained to the [Hotline] about Dawson's behavior and its disruption to the effective operation of the LES unit in Lynchburg." Docket No. 23, at ¶ 67 A complaint about one employee's disruptive effect on the effective operation of the office does not constitute an allegation of either wrongdoing or abuse within the meaning of the statute. Such a complaint does not allege a violation of any statute or rule, and it does not allege a substantial misuse of state funds. Accordingly, Defendants' motion to dismiss Plaintiff's claims under the Whistle Blower Act will be granted.

### J. VIOLATION OF VA. CODE § 40.1-51.2:1

Supinger "complained to the Virginia Department of Labor and Industry (the 'Department') about occupational health and safety violations." Docket No. 23, at ¶ 244.

Supinger alleges that the Commonwealth, the DMV, Holcomb, Hill, and Thorpe "retaliated against Supinger for his complaining to the Department . . . [by] transferring Supinger twice and terminating his employment with DMV." *Id.* at ¶ 247. Supinger claims this conduct violated Va. Code § 40.1-51.2:1.

Section 40.1-51.2:1 provides that "[n]o person shall discharge or in any way discriminate against an employee because the employee has filed a safety or health complaint or has testified or otherwise acted to exercise rights under the safety and health provisions of this title for themselves or others." If an employee believes that they have been discriminated against under this provision, the employee "may, within 60 days after such violation occurs, file a complaint with the Commissioner alleging such discharge or discrimination." Va. Code § 40.1-51.2:2. If the Commissioner "refuse[s] to issue a charge against the person that allegedly discriminated against the employee, the employee may bring action in a circuit court having jurisdiction over the person allegedly discriminating against the employee, for appropriate relief." Va. Code § 40.1-51.2:2. If a plaintiff fails to exhaust these administrative remedies, plaintiff's claim is completely barred. *See Bass v. E.I. DuPont de Demours & Co.*, 28 Fed. Appx. 201, 205 (4th Cir. 2002) (per curiam); *Judy v. Nat'l Fruit Prod. Co.*, 40 Va. Cir. 244, 244–45 (Va. Cir. Ct. 1996).

Plaintiff has failed to allege that he filed a complaint with the Commissioner or that the Commissioner refused to issue a charge of discrimination. Accordingly, Supinger has failed to exhaust his administrative remedies. Supinger's claim under Va. Code § 40.1-51.2:1 will therefore be dismissed.

K.  VIOLATION OF THE VIRGINIA COMPUTER CRIMES ACT

Supinger alleges that Hill, "at the direction of Defendant Holcomb, . . . used a computer or computer network to intentionally examine without authority Supinger's identifying

information, and copied that information and disseminated it to Capitol Police at the General Assembly, and to personnel in the Governor's Mansion . . . ." Docket No. 23, at ¶ 257. Supinger claims that Holcomb and Hill's conduct violated the Virginia Computer Crimes Act ("VCCA"), Va. Code §§ 18.2-152.4 and 18.2-152.5.

Section 18.2-152.4 makes it "unlawful for any person, with malicious intent, to . . . [u]se a computer or computer network to make or cause to be made an authorized copy, in any form, including, but not limited to, any printed or electronic form of computer data, computer programs or computer software residing in, communicated by, or produced by a computer or computer network." Va. Code § 18.2-152.4(A)(6).[16] Section 18.2-152.5 makes it a crime to "use[] a computer or computer network and intentionally examine[] without authority any employment, salary, credit or any other financial or identifying information . . . relating to any other person." Va. Code § 18.2-152.5(A).

"A person is 'without authority' when he knows or reasonably should know that he has no right, agreement, or permission or acts in a manner knowingly exceeding such right, agreement, or permission." Va. Code § 18.2-152.2.

In order to state a claim under the statute, Supinger must plead facts sufficient to show that the Defendants were "without authority" or that the copying of the information was "unauthorized." *See, e.g.*, *Global Policy Partners, LLC v. Yessin*, 686 F. Supp. 2d 631, 640 (E.D. Va. 2009). Supinger has pled in conclusory fashion that the Defendants "used a computer or computer network to intentionally examine without authority Supinger's identifying information . . . ." Docket No. 23, at ¶ 257. Aside from this conclusion, Supinger's complaint lacks sufficient factual allegations "to raise a right to relief above the speculative level." *See*

---

[16] Although a criminal statute, the VCCA provides a private right of action to "recover for any damages sustained and the costs of suit" to "[a]ny person whose property or person is injured by reason of a violation" of the statute. Va. Code § 18.2-152.12(A).

*Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678; *see also Stultz*, 2015 WL 4648001, at *12 (finding that the plaintiff failed to state a plausible claim for relief because he merely "assert[ed], in a conclusory fashion, that his superiors used a computer to examine his personal records without authority . . . ."). Accordingly, Defendants' motion to dismiss Plaintiff's claim under Va. Code §§ 18.2-152.4 and 18.2-152.5 will be granted.

L.  TORTIOUS INTERFERENCE WITH CONTRACT EXPECTANCY

Supinger claims he "received conditional offers of employment for positions for which he was qualified." Docket No. 23, at ¶ 269. Supinger claims that Hill and Thorpe "interfered with Supinger's expectation of employment by providing inaccurate, false and defamatory, incomplete information to Supinger's prospective employers . . . ." *Id.* at ¶ 270. Supinger claims that Thorpe and Hill's conduct amounts to tortious interference with contract expectancy.

To establish a *prima facie* case of tortious interference with contract expectancy, the plaintiff must show: "(i) the existence of a valid contractual relationship or business expectancy; (ii) knowledge of the relationship or expectancy on the part of the interferer; (iii) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (iv) resultant damage to the party whose relationship or expectancy has been disrupted." *Lewis-Gale Med. Ctr., LLC v. Alldredge*, 710 S.E.2d 716, 720 (Va. 2011) (quoting *DurretteBradshaw, P.C. v. MRC Consulting, L.C.*, 670 S.E.2d 704, 706 (Va. 2009)).

Throughout much of the relevant portions of his complaint, Supinger alleges merely that he "ha[s] received conditional offers of employment for positions for which he was qualified." Docket No. 23, at ¶ 269. In order to establish a *prima facie* case of the tort, however, Supinger must allege a "specific, existing contract or business expectancy or opportunity that has been interfered with in a tortious manner." *Masco Contractor Servs. East, Inc. v. Beals*, 279 F. Supp.

2d 699, 710 (E.D. Va. 2003) (emphasis omitted). Thus, conclusory allegations that "[o]n several occasions [he] has been extended conditional offers of employment," Docket No. 23, at ¶ 144, are insufficient.

After amending his complaint, Supinger specifies that he received an offer from "SOC, LLC." *Id*. Aside from providing "a formulaic recitation of the elements of [the tort]," *Twombly*, 550 U.S. at 555, Supinger's complaint does not contain sufficient factual matter to state a claim. His conclusory allegations that Defendants interfered with this job offer is insufficient. Accordingly, Defendants' motion to dismiss Plaintiff's claim for tortious interference with contract expectancy will be granted.

## IV.    CONCLUSION

For the aforementioned reasons, Defendants' motion to dismiss will be granted in part and denied in part. An appropriate order will accompany this memorandum opinion.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this ___2nd___ day of March, 2016.

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE