ROBERT. E. LEE SUPINGER, JR.,

         *Plaintiff,*

   v.

COMMONWEALTH OF VIRGINIA ET AL.,

         *Defendants.*

CASE NO. 6:15-CV-00017

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

   This dispute relates to Plaintiff's termination from his employment as a law enforcement officer with the Virginia Department of Motor Vehicles ("DMV"). Plaintiff has brought claims against: the DMV; the Commonwealth of Virginia; DMV Commissioner Richard Holcomb, DMV Assistant Commissioner Joseph Hill; DMV Human Resources Director Jeannie Thorpe; DMV Director of Law Enforcement Donald Boswell; and DMV Director of Fuels Tax Tom Penny. The parties have filed cross motions for summary judgment. The claims at issue in these motions are: Title VII racial discrimination (Count I); Title VII retaliation (Count II); First Amendment retaliation (Count III); Procedural Due Process violations (Count IV); 42 U.S.C. § 1983 supervisory liability (Count V); and 42 U.S.C. §§ 1981 and 1983 racial discrimination (Count VI). Plaintiff seeks summary judgment on the following: (1) whether he has established a *prima facie* case of racial discrimination under Counts I and VI; (2) whether he engaged in a protected activity and faced an adverse action under Count II; and (3) whether his speech was on matters of public concern in Count III. Defendants seek summary judgment on all of Plaintiff's claims except for Count IV, which is on appeal to the Fourth Circuit on the question of qualified immunity.

The Court will grant Defendants' motion as to Count I, as Plaintiff's Title VII racial discrimination claim was untimely.

The Court will also grant Defendant's motion as to Count II. Plaintiff has failed to demonstrate that Defendants' reasons for terminating him were pretext for wrongful retaliation over Plaintiff's filing of EEOC charges and internal grievances.

As to Count III, the Court will grant Defendants' motion on the grounds that each of the defendants is entitled to qualified immunity. It was not clearly established that Defendants' conduct was in violation of the First Amendment.

For Count IV, it is uncontested that the claim against Defendant Penny should be dismissed. The Court will decline to address any damages issue until the issue of qualified immunity has been resolved by the Fourth Circuit.

Count V is dependent on a finding of constitutional violations in Counts III and IV. The Court will grant partial summary judgment with respect to supervisory liability for Count III, as that underlying claim is barred by qualified immunity. To the extent Defendants moved for summary judgment as to supervisory liability for Count IV, it is denied.

Count VI is evaluated under the same substantive standard as Count I. Under that standard, Plaintiff has failed to carry his burden of demonstrating that Defendants' legitimate reasons were pretext for unlawful racial discrimination, and Defendants' motion will be granted.

I. **Facts**

Although there are numerous claims that necessitate a somewhat lengthy recitation of the facts, the overall narrative of this case is not complicated. Plaintiff was unhappy with several aspects of his workplace at the DMV, including the conduct of a coworker Jennifer Dawson and the proposed reorganization of the DMV. As a result, Plaintiff took actions with the potential to

create conflict with DMV management, such as helping launch a criminal investigation into Dawson, filing numerous grievances, and reporting his concerns to elected state officials. Plaintiff also faced negative employment actions during the relevant period, including being transferred to a distant office and eventually being terminated. The question before the Court is whether these negative actions taken against Plaintiff were wrongful and discriminatory, or whether they were lawful and justified. The specifics of this dispute are discussed in more depth below, organized by the claim to which they relate.

### a. Racial Discrimination (Counts I and VI)

Plaintiff was reassigned from the Lynchburg DMV office to the one in Waynesboro. Plaintiff alleges that this transfer was motivated by racial discrimination because he is married to a woman of a different race.

### i. Status Before Transfer

Plaintiff worked as an Assistant Special Agent in Charge ("ASAC") in the Appomattox Division of Virginia Department of Motor Vehicles ("DMV"), as a member of Law Enforcement Services. (Dkt. 184-1 ¶ 2). Plaintiff's primary office was located in the lower level of the Lynchburg DMV Customer Service Center ("Lynchburg CSC"). (Dkt. 181-47 at 1). Plaintiff, who is white, was married to a non-white Korean female who worked in the Customer Service Delivery Administration in the upper level of the Lynchburg CSC. (*Id*.) The two did not interact in the course of their normal business and had worked in the same Lynchburg DMV for 12 years prior to his reassignment. (*Id*.; dkt. 184-3).

### ii. Transfer

DMV Assistant Commissioner Joseph Hill reassigned Plaintiff from the Lynchburg CSC to the Waynesboro CSC on March 16, 2012. (Dkts. 184-3; 181-63 ¶ 14). At the time of the

reassignment, the reason given was to effectuate DMV's nepotism policy by separating him from his wife who worked in the same building. (Dkt. 184-2 at 28). In a subsequent email a few days later, DMV Commissioner Richard Holcomb claimed that the primary reason for the transfer was a need for leadership in the Waynesboro CSC, as Senior Special Agent Tony Stovall had recently transferred from the Waynesboro office to the Culpeper Division. (Dkt. 184-3).

The reassignment caused several disruptions to Plaintiff. As a result of the reassignment, Plaintiff was required to drive approximately 1.5 hours each way from his home to the Waynesboro office. (Dk. 184-2 at 36). Additionally, Plaintiff felt the move was effectively a demotion because he supervised few agents in Waynesboro and he conducted more fieldwork rather than managerial tasks. (*Id*. at 35–36, 66).

However, there were several factors mitigating these disruptions. Plaintiff was not required to travel to Waynesboro every day, and in fact only travelled there about two days per week. (Dkt. 181-60 at 31). Relatedly, he had office space available to him in Lynchburg for the times he worked there. (Dkt. 187-1 ¶ 6). Plaintiff's travel time was counted as time worked, and it was made using a state car with gas paid for by the state. (Dkts. 181-60 at 30–31; 181-49 at ECF 5). Plaintiff also retained his same title and salary after the reassignment. (Dkt 181-60 at 36 and 38). Further, he continued to do some managerial tasks associated with the ASAC position, such as coordinating schedules, assigning cases, and completing performance evaluations. (Dkts. 181-60 at 40, 39, 44).

### b.  Title VII Retaliation (Count II)

Plaintiff filed several internal grievances and EEOC charges.[1] Plaintiff alleges that he was terminated in retaliation for filing these complaints.

### i. EEOC Charges

Plaintiff filed an EEOC intake questionnaire related to alleged racial discrimination on January 17, 2013. (Dkt. 181-48). However, the EEOC did not produce a charge based on his questionnaire until many months later. (*See* dkt. 187-5). Plaintiff finally filed an EEOC charge alleging racial discrimination related to his reassignment on December 10, 2013. (Dkt. 181-45).[2] The charge alleged racial discrimination on the basis of his interracial marriage. (*Id.*) The charge also indicated that the discrimination was continuous, with the earliest incident occurring on March 16, 2012 (the reassignment) and the latest occurring on January 13, 2013. (*Id.*)

Plaintiff's declaration includes mentions of several other EEOC charges that were not presented as evidence and were only discussed in a footnote in Plaintiff's opposition to Defendants' motion. (Dkt. 187 at 13 n.6). Those are: a gender discrimination intake questionnaire in October 2012, a gender discrimination charge in December 2012, a retaliation intake questionnaire in March 2013, and an unspecified discrimination charge in March 2012. (Dkt. 187-1 ¶ 15). These EEOC charges will also be considered.

---

[1]    The precise set of grievances and Charges of Discrimination which is at issue in the cross motions for summary judgment is unclear. In his summary judgment motion, Plaintiff only mentions a single grievance related to his transfer to Waynesboro (Dkt. 184 at 2), but then states that his Title VII Retaliation claim is based on "grievance procedures . . . as set forth *supra*." (Dkt. 184 at 14). The parties have only substantively briefed the EEOC charge related to racial discrimination that was filed in December 2013. The Court will interpret the claim as encompassing the various grievances and EEOC charges raised in Plaintiff's amended complaint. (Dkt. 133).

[2]    Plaintiff contends in his motion that the EEOC charge was filed January 17, 2013. (Dkt. 184 at 3). However, the document he cites is not dated. (Dkt. 184-5). Thus, it appears that Plaintiff misleadingly stated that his EEOC charge was filed January 17, when he meant that his EEOC questionnaire filed on that date should be construed as his charge. (*See infra* Part III(a)).

### ii. Internal Grievances

Plaintiff filed a number of internal grievances in the weeks and months leading up to his termination. His grievances related to his transfer to Waynesboro (dkts. 181-49, 184-2 at 55), an allegation letter sent to him (dkt. 133 ¶ 54); his transfer to the Fuels Tax Enforcement division (*Id*. ¶ 80); DMV's alleged retaliation against him (*Id*. ¶ 102); and his performance evaluation (*Id*. ¶ 119).

### c. First Amendment Retaliation (Count III)

Plaintiff communicated with several public officials regarding his various concerns. Plaintiff alleges that he was terminated in retaliation for speaking to these officials, in violation of his First Amendment rights.

### i. Subjects of Plaintiff's Speech

### 1. Coworker Jennifer Dawson's Behavior

Throughout the relevant period, Plaintiff observed and reported on what he believed to be troubling and dangerous behavior from a coworker, Jennifer Dawson. For instance, he perceived that Dawson was sometimes paranoid about her own safety.[3] She had multiple instances where she behaved in an animated or emotional manner Plaintiff felt was inappropriate in the office context.[4] Throughout these various acts, Supinger and other coworkers expressed concern about Dawson's behavior to their superiors.[5]

---

[3]  *See, e.g.,* dkts. 184-6 ¶ 28 (becoming enraged when coworkers failed to leave their offices unlocked as a means for her escape in the event of an emergency); *id*. ¶ 24 (requesting and receiving a mechanism to remotely control entry to the office and a panic button to use in case of an emergency; *id*. ¶ 21 (obtaining a concealed weapons permit); 184-10, 184-11, 184-12 (expressing belief that her stepson was trying to murder her).

[4]  *See, e.g.,* dkts. 184-7 at 22–29 (loud, animated cell phone conversation in parking lot); *Id*. at 32–39 (crying, slamming table, stomping feet in meeting with Stultz); Pl. Ex. 10 at ECF 3 (sitting at her desk in "disarray"); *id*. (found crying and discussing son's attempts to kill her);

Dawson also had two physical confrontations with coworkers. On February 23, 2012, Dawson threw a stack of papers at her supervisor, Special Agent in Charge David Stultz. (Dkt. 184-6 ¶ 35). On September 13, 2012, there was an incident in the women's bathroom where Dawson shoved or pushed Anastasia Wootten (a Special Agent at the Lynchburg CSC), although the severity and circumstances of this incident are a matter of considerable debate. (*See* dkt. 181-40 at 10–11, 181-16). As a result of the incident, Wootten, with the support and aid of her supervisors Supinger and Stulz, pursued criminal charges against Dawson. (Dkt. 187-1 ¶ 17). Based on her aforementioned behavior, Supinger felt that Dawson was "an employee who is a danger in the workplace." (Dkt. 184-43)

## 2. Reorganization

On June 27, 2012, Hill announced a reorganization of the DMV's law enforcement divisions. (Dkts. 184-6 ¶ 70; 181-7). Prior to the reorganization, the boundaries of the seven DMV "home divisions" mirrored those of the Virginia Statewide Radio System ("STARS") operated by the Virginia State Police ("VSP"). (Dkt 184-6 ¶ 76). The reorganization caused the DMV law enforcement divisions to become aligned with the eight DMV Customer Service Management Administration Districts instead of the STARS divisions. (Dkt. 181-63 ¶¶ 5–9). Under the new alignment, a DMV officer's home division could contain multiple STARS divisions, each with their own dispatch center. (Dkt. 184-6 ¶ 83). DMV law enforcement officers' radio equipment, however, was programmed to function within a single STARS division. (*Id*. ¶ 80). After the reorganization, DMV management required officers to change to their radio channels when they entered a new STARS division so that they were communicating

---

dkt. 184-6 at ¶36 (crying at her desk and holding her chest); dkt. 184-7 at 32–39 (moaning under desk).

[5]      *See, e.g.,* dkts. 184-18; 184-9 at 52–53; 184-10; 184-6 ¶¶ 20, 36; 184-17; 184-19.

with the dispatcher that controlled their geographic region. (Dkts. 184-6 at 87; 181-7). Failure to do so might result in loss of communication or communicating with a dispatch that was geographically remote from the officer's location. (Dkt. 184-6 ¶¶ 84, 85).

Michael Bolton, the Program Director for STARS, opined on the change at several points. In an email to Stultz in 2010, he expressed concern with DMV's plan to change its boundaries away from the STARS ones. (Dkts. 181-5). However, he also clarified in 2012 that training agents to change their radios as they crossed STARS boundaries was a possible solution to the problems presented. (Dkt. 181-6; *see also* dkt. 192-11 ¶ 5).

Additionally, as a result of the reorganization, Plaintiff's Appomattox Division was merged with the Roanoke Division and Supinger was to be transferred to the Fuels Tax Enforcement unit. (Dkt. 93-1). Supinger complained of this transfer and was granted a reassignment to the Hampton Division instead. (*Id.*) Finally, Supinger expressed concern that the reorganization would result in skewed supervisor-to-employee ratios, resulting from too many supervisors in certain locations. (*See, e.g.,* dkt. 184-42).

### 3. FWA Hotline

On October 11, 2011, Supinger filed an anonymous Fraud, Waste, and Abuse (FWA) complaint regarding Dawson's conduct to the "Hotline" run by the Virginia Department of State Internal Audit ("DSIA"). (Dkt. 184-18). The complaint primarily concerned the threat to others in the office posed by Dawson due to her unstable mental state. (*Id.*) The Hotline complaint was referred to James Womack, Director of Internal Audit at DMV, who assigned investigation of the case to Cheryl Sanders.[6] (Dkt. 188-8 at 31).

---

[6] Defendant Hill was the supervisor of the Internal Audit division at the time of the complaint, and thus was Womack's supervisor. (Dkt. 188-8 at 29). However, in Hotline cases,

Sanders conducted the investigation by reviewing documents and interviewing both Stultz and Hill. (Dkt. 184-39 at P3). In coordination with Tim Sadler, Hotline Coordinator at DSIA, Sanders narrowed the scope of the investigation to complaints that Dawson was not passing along phone messages and was absent from her desk, rather than investigating allegations that she was a danger to herself and coworkers. (*See* dkt. 188-2). The report concluded that Dawson's management was sufficiently addressing the phone issues. (Dkt. 184-39 at P8).

Sanders decided that the allegations regarding Dawson as a danger to others "lacked specificity" but decided to discuss them with Dawson's supervisors in interviews to see if they were aware of perceived problems. (Dkt. 184-39 at P3.) The report found that management was addressing these "performance issues" and that Sanders did not find any evidence that Dawson "placed co-workers at risk of physical harm," or that she was "destroying morale or damaging productivity." (*Id.* at P4). Plaintiff, however, finds several issues with this conclusion. Individuals associated with the Hotline process have stated that it is not the intended role of the Hotline to address concerns such as the potential safety threat posed by Dawson. (Dkts. 188-8 at 54; 191-6 at 111). Furthermore, Womack had instructed Sanders to reword portions of her summary of her interview with Stultz in which Stultz described Dawson's erratic and potentially harmful behavior. (Dkt. 191-6 at 111-114).

After receiving the report, Stultz contacted Sadler to communicate his belief that the investigation had not been adequately performed, particularly with respect to the Dawson safety issue. (Dkt. 188-7 at 37). Sadler considered Stultz's objections and conducted additional

---

the chain of command went back through DSIA and Hill was insulated from the investigation and could not access its files or dictate its scope. (*Id.* at 136–37).

investigations of his own, but ultimately concluded that the report was adequate as written. (*Id.* at 39).

### 4. Obstruction of Justice

Plaintiff believed there was an obstruction of justice with respect to Commonwealth Attorney Kelly Osterbind's prosecution of the incident occurring between Wootten and Dawson in the women's bathroom. Plaintiff primarily objected to a Hill phone call with Osterbind discussing the case. Hill told Osterbind that he, Holcomb and Penny did not believe the incident constituted an assault and battery. (Dkt. 187-21 at 361-363). Senior Special Agent Andrew Hicks told Plaintiff that Osterbind had described the conversation to Hicks as "unpleasant." (Dkt. 187-34 at 141-42). However, Osterbind has stated that the conversation was "pleasant and professional." (Dkt. 181-20). Tom Penny also contacted Osterbind to determine what "Wootten told Ms. Osterbine[sic] . . . concerning her encounter with Jennifer Dawson." (Dkt. 187-39). In that meeting, he told Osterbind that the incident was not an assault in his opinion, and "expressed concern that the facts gathered . . . indicated a possibility that the criminal justice system had been manipulated." (*Id.*) Finally, Hill's assistant Ronna Howard contacted Osterbind upon direction of Hill in order to investigate the claim that Osterbind had been threatened into not prosecuting Dawson by Hill and other DMV officials. (Dkts. 187-35; 187-21 at 361-363). Dawson was eventually tried in a bench trial and found not guilty. (Dkt. 188-4).

### ii. Communications with Public Officials

Having discussed the concerns of Supinger that may constitute constitutionally protected speech under his First Amendment retaliation claim, the Court now turns to discuss whether and when these complaints were communicated with others.

### 1. April 27, 2012 – Meeting with Senator Steve Newman

Supinger, using his private car, drove himself, Stultz, Hicks, and Wootten to meet with Virginia Senator Steve Newman. (Dkt. 184-22 at ECF 6). The parties discussed the "unsafe environment" created by Dawson and other Dawson-related concerns. (*Id*.) Supinger shared his belief that his transfer to Waynesboro had been in retaliation for speaking out about Dawson at a Charlottesville meeting with Holcomb. (*Id*.) Plaintiff also raised the concern that the transfer resulted in wasted taxpayer money as a result of the increased commute. (*Id*.; dkt. 184-2 at 103) Finally, Supinger expressed his concern that he was being retaliated against for filing an FWA Hotline complaint. (*Id*.; Dkt. 191-3 at 106). Near the end of the meeting, Senator Newman suggested that Stultz "file a grievance for any personnel actions." (Dkt. 184-22 at ECF 6).

### 2. May 14, 2012 – Meeting with Police Benevolent Association ("PBA")

Supinger and other officers held a conference call with Police Benevolent Association Executive Director Sean McGowan. (Dkt. 184-1 ¶ 12). In the call, Supinger discussed his concerns with Dawson, as well as alleged fraudulent manipulation of his Hotline complaint that resulted in no appropriate action being taken against Dawson. (*Id*.)

### 3. September 14, 2012 –Email to Senator Newman

Supinger sent an unsolicited email to Senator Steve Newman from his private account following up on the concerns discussed in their April meeting. (Dkt. 184-42). "First and most importantly," the email discussed Dawson's conduct. (*Id*. at ECF 1). Second, the email discussed STARS and the reorganization. Specifically, the email noted how the reorganization would result in Supinger's transfer to Hampton, which would place him under financial strain and made it so the "transfer to Waynesboro is no longer an issue." (*Id*.) The email also mentioned the increased supervisor-to-employee ratio that would result from the reorganization. (*Id*. at ECF 2). Senator Newman's assistant replied to the email by stating that Senator Newman would pass the

concerns along to Commissioner Holcomb, but that "[Senator Newman] does not interfere with personnel matters in state agencies." (*Id*. at ECF 2–3).

### 4. September 16, 2012 – First Email to Governor McDonnell.

Supinger sent an unsolicited email to Governor McDonnell from his private account. (Dkt. 184-43). Although Supinger  initially mentioned retaliation for filing his Hotline complaint, he then expressly stated: "I am not writing regarding these issues though, **but an employee who is a danger in the workplace.**" (*Id*. at ECF 1) (emphasis in original). The email then went on to discuss Dawson's behavior in-depth. (*Id*. at ECF 1–2). Supinger also expressed his concern that DMV management would retaliate against him and Wootten, and was obstructing justice by interfering in the criminal case against Dawson. (*Id*. at ECF 2).

### 5. September 24, 2012 and October 5, 2012 –Emails to Various Elected Officials

On September 24, 2012, Supinger sent an identical email to several Virginia elected officials, including: Delegates Habeeb, May, Rust, Scott, Garrett; and Senators Favola, Carrico, and Puckett. (Dkts. 184-44–184-51). The emails focused on waste issues related to the reorganization. First, Supinger opined that the reorganization would be inefficient because significant money had been spent creating the STARS system boundaries, and now DMV was removing itself from alignment with the STARS boundaries. (*See id*.) Second, Supinger worried about waste resulting from skewed supervisor-to-employee ratios. (*See id*.)

Supinger sent a follow-up email to each of these officials on October 5th. (*See* Dkts. 184-44 to184-51). The stated purpose of these emails was to "clear the record" in case the officials thought he was just a disgruntled employee bringing up personnel issues. (*See, e.g.*, dkt. 42 at ECF 2–3). Supinger reiterated that his concern regarded waste resulting from the reorganization,

specifically the supervisor ratios. (*Id*.) Supinger also detailed some of his communications with supervisors and allegedly retaliatory actions taken against him. (*Id*.)

### 6. October 4, 2012 –Second Email to Governor McDonnell

This email primarily addressed Supinger's obstruction of justice concerns. (Dkt. 184-52). Supinger explained the communications between DMV officials and Osterbind which he believed constituted obstruction of justice. (*Id*.) He also defended his right to contact the Governor to bring up these concerns after he had been cautioned against doing so by Holcomb. (*Id*.)

### 7. October 12, 2012 – Meeting with Senator Creigh Deeds

Supinger, other members of the Lynchburg CSC, and members of the PBA met with Senator Creigh deeds to discuss "public concerns." (Dkt. 188-12 ¶ 5). Speaking primarily through Stultz, the group discussed "safely concerns, failures in delivery of services to citizens; inappropriate and hostile actions; violations of law and policy; impropriety and malfeasance of government leadership." (*Id*. ¶ 8). The parties specifically discussed: manipulation of the FWA Hotline, safety issues with the new STARS arrangement, and waste issues with the reorganization and new STARS arrangement. (*Id*. ¶¶ 11, 13, 16; dkt. 184-1 ¶ 13).

### 8. December 19, 2012 – Letter to Governor McDonnell

Supinger sent a letter to Governor McDonnell on December 19, his third correspondence with McDonnell. The letter primarily concerned retaliation against Supinger and stated "it is most important that I clear my name with you." (Dkt. 184-53 at ECF 1) (emphasis removed). Supinger defended his characterization of the Osterbind situation, attempting to rebut an investigation by the PBA which "basically states that I am a liar and fabricated the entire incident." (*Id*.) Supinger also suggested that some obstruction might still be occurring even if

Osterbind's characterization of her conversation with DMV officials was correct. (*Id.*) Supinger further criticized Osterbind for not informing him directly of the nature of her conversations with DMV officials. (*Id.* at ECF 3). Finally, Supinger cast doubt about whether DMV's investigation into potential obstruction of justice was sufficiently unbiased and thorough. (*Id.* at ECF 3–4).

### 9. February 5, 2013 – Third Email to Governor McDonnell[7]

Plaintiff sent a third email (and fourth communication) to Governor McDonnell on February 5th, loosely related to the Osterbind investigation. (Dkt. 133-13). With regard to Osterbind, Plaintiff complained that the DMV had "leaked" Dawson's personnel file to the defense counsel. (*Id.*) Plaintiff's email primarily concerned fears that he was being retaliated against and that an investigation was being conducted in order to fabricate charges against him and his colleagues. (*Id.*)

### d. Termination

Plaintiff was suspended by the DMV on February 28, 2013. (Dkt. 184-1 ¶ 6). Plaintiff was terminated on April 9, 2013. (Dkt. 184-1 ¶ 7). On that day, the DMV provided five written notices as rationales for his termination, described below.

### i. Investigation into Dawson

The first written notice alleges that Supinger failed to "impartially discharge" his duties by conducting a biased investigation into the Dawson-Wootten incident. (Dkt. 181-24). Generally, the written notice states that he erred by investigating Dawson knowing that he had personal animus towards her, by failing to interview her during the investigation, and by including irrelevant personal grievances in his report. (*Id.*) At the time of the investigation,

---

[7] Plaintiff fails to mention this speech in his motion or briefs. However, Plaintiff did allege this speech was on matters of public concern in his complaint and Defendants raised this speech in their motions to dismiss. Therefore, it will be discussed.

Supinger was under orders not to talk with Dawson, so he could not interview her during the course of his investigation into her own conduct. (*Id.*) Supinger also failed to conduct a formal interview of Wootten — Dawson's primary antagonist in the incident at question — and accepted her word at face value instead. (*Id.*) Supinger's report also included allegations about Dawson conduct dating back years, much of which was only extremely tangentially related to the Dawson-Wootten incident at issue. (*Id.*) Finally, the written notice alleges that the report was inaccurate and contradicted by other evidence in several places. (*Id.*)

### ii. "Joke" Employee Work Profile for Dawson

The second written notice relates to Supinger's circulation of a "joke" Employee Work Profile ("EWP") for Dawson. (Dkt. 181-25). Supinger had made demeaning edits to the EWP for Dawson's position, including adding the requirement of "mental stability" and the duties of cleaning the office and making coffee. (*Id.*) Supinger himself admitted that the EWP edits were a "joke." (*Id.*; dkt. 181-38 at 127).

### iii. Offensive Email Regarding Dawson

In regards to an upcoming meeting between Dawson and Hill, Supinger sent an email to several subordinates stating that "[o]ne can only imagine what falsehoods [Dawson] is planning to relay to [Hill]" and that he "thought each of you should know what we are up against." (Dkt. 181-11). The written notice found this email was a violation of Plaintiff's duty to communicate with subordinates in a matter that builds trust and improves morale, and may have constituted retaliation against Dawson. (Dkt. 181-26).

### iv. "Psych-Ops" Emails

Believing that management was reviewing his emails, Plaintiff admitted to sending emails that he considered "pysch-ops" in order to "get a rise out of" management. (Dkt. 181-38

at 136). A written notice was issued on the basis that sending emails "intended to disrupt and antagonize" was "unprofessional" and that drafting such emails was "an abuse of state time." (Dkt. 181-27).

### v. Viewing of Confidential Information

The final written notice relates to Supinger's viewing of another DMV's employee's performance review. (Dkt. 181-44). Supinger used the information obtained from that employee's review to file a grievance over his own, lower-than-expected, performance score. (*Id.*) Supinger claimed that he viewed the evaluation score accidentally as it was on the top page. (*Id.*) However, this assertion conflicted with his supervisor Roger Stone's observation that the evaluation score was found near the end of the stapled packet. (*Id.*) Stone found fault in Supinger's actions both for viewing another employee's confidential performance evaluation and for lying about how he came to view the information. (*Id.*)

## II. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). If, however, the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. In

considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011).

## III.    Discussion

### a.  Count I – Title VII Racial Discrimination

Plaintiff brings a claim of racial discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* related to his transfer to Waynesboro. Plaintiff alleges that he was transferred to separate him from working in the same office as wife because they are of different races. However, because Plaintiff failed to timely file an EEOC charge related to this alleged discriminatory act, Defendants' motion will be granted as to Count I.

In Virginia, an EEOC charge must be brought within 300 days of the alleged discrimination. *See* 42 U.S.C. § 2000e-5(e)(1); *Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404 (4th Cir. 2002). If an EEOC charge is not timely filed, the underlying Title VII claim will be procedurally barred. *Id*. Here, the parties contest the date of both the discrimination and the filing of the EEOC charge.

As to the date of the discrimination, Defendants argue it occurred on the date of Plaintiff's transfer to Waynesboro: March 16, 2012. Plaintiff, however, argues that the discrimination was listed as a "continuing action" in his EEOC charge and persisted up until January 13, 2013. (*See* dkt. 187-37).

Plaintiff's assertion in his EEOC charge that his discrimination was continuous is not legally dispositive. Instead, "district courts have examined the facts of each case to determine whether a continuing policy of discrimination is allegedly practiced or whether the situation involves only a series of discrete decisions." *Soble v. Univ. of Maryland*, 572 F. Supp. 1509, 1515 (D. Md. 1983). Under this examination, "current effects, without a present act of discrimination, do not constitute a continuing violation." *Sanders v. Duke Univ.*, 538 F. Supp. 1143, 1146 (M.D.N.C. 1982); s*ee also United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977) ("[E]mphasis should not be placed on mere continuity; the critical question is whether any present *violation* exists."). In *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), the Supreme Court specified that "discrete acts" include: "termination, failure to promote, denial of transfer, or refusal to hire." *Id*. at 114.

The alleged discriminatory act here is Plaintiff's reassignment to Waynesboro (*see* dkt. 187-37), which is the type of "discrete" act contemplated by *Morgan*. Under *Morgan*, Plaintiff's allegations of subsequent wrongful acts cannot resuscitate any claim related to the discrete transfer. *See Morgan*, 536 U.S. at 113. Instead, "the time for filing a charge of employment discrimination with the EEOC . . . begins when the discriminatory act occurs." *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 621 (2007); *see also Mezu v. Morgan State Univ.*, 367 F. App'x 385, 388 (4th Cir. 2010) ("The time the initial employment decision was made and communicated triggered the commencement of the limitations period."). Accordingly, the violation is not continuous and Plaintiff's 300-day window in which to file his EEOC charge began on March 16, 2012 and ended on January 11, 2013.

The evidence before the Court shows that Plaintiff filed an EEOC racial discrimination charge on December 10, 2013 — well outside of the 300-day window. (Dkt. 181-45). Plaintiff,

however, argues that his EEOC intake questionnaire filed January 17, 2013 should be counted as his charge, and that the limitations period should have been equitably tolled, given the particular circumstances of its filing. (*See* dkt. 181-48). While Plaintiff is generally correct that a court may construe an EEOC questionnaire as a charge or apply equitable tolling to the filing of an EEOC charge, neither theory would apply here. Plaintiff's questionnaire, filed January 17, 2013, was untimely even if construed as a charge. Similarly, equitable tolling does not apply because the acts that form the basis of Plaintiff's tolling arguments themselves fell outside of the 300-day period. Accordingly, Plaintiff's racial discrimination claim was not timely filed with the EEOC and is procedurally barred. Defendants' motion as to this claim will be granted.

### b. Count VI – 42 U.S.C. §§ 1981 and 1983 Racial Discrimination[8]

Plaintiff brings a claim of racial discrimination under 42 U.S.C. § 1981, which grants all persons within the jurisdiction of the United States "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," and 42 U.S.C. § 1983. Plaintiff's racial discrimination claim under 42 U.S.C. §§ 1981 and 1983 is not bound by the same timeliness requirements as his Title VII claim. However, the claims share the same substantive analysis. *See Supinger v. Virginia*, 167 F. Supp. 3d 795, 817 (W. D. Va. 2016) ("The elements of a *prima facie* case under § 1981 mirror the elements required to establish a *prima facie* case under Title VII." (citing *Ford v. GE Lighting*, LLC, 121 Fed. App'x. 1, 5 (4th Cir. 2005) (*per curiam*))). The Court analyzes the merits of Plaintiff's § 1983 racial discrimination claim under the *McDonnell Douglas* burden shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

---

[8] The Court will discuss only Defendant's summary judgment motion as to Counts VI, II, and III. Because the Court will conclude that Defendant is entitled to summary judgment that will result in the dismissal of these claims, whether Plaintiff is entitled to partial summary judgment as to some elements of the claim need not be decided by the Court.

### 1. *Prima Facie* Case

To prevail on a § 1983 racial discrimination claim, Plaintiff must show that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) at the time of the adverse employment action, he was performing up to his employer's expectations; and (4) similarly situated employees who are not members of the protected class received more favorable treatment. *See Holiday v. New Hanover Cty. Registrar of Deeds*, 317 F. App'x 344, 345 (4th Cir. 2009) (citing *Williams v. Cerberonics*, Inc., 871 F.2d 452, 455 (4th Cir. 1989)). The second and fourth elements are disputed by the parties. However, for the purposes of this opinion, the Court will assume that Plaintiff has made out a *prima facie* case for racial discrimination and will proceed to the next stage of the *McDonnell Douglas* burden shifting framework.

### 2. Non-Discriminatory Reasons

Under the *McDonnell Douglas* burden-shifting framework, Defendants have the burden of establishing "some legitimate, non-discriminatory reason" for the adverse action. *See McDonnell Douglas*, 411 U.S. at 803. Defendants assert that the non-discriminatory reasons for the transfer were to comply with the DMV's nepotism policy and to fill a leadership void in the Waynesboro office. (*See* dkt. 181-13). Under the "spirit" of the nepotism policy, Plaintiff was transferred to avoid having him work in the same office as his wife. (*Id.*) Defendants also justified the move on the basis of a leadership void in the Waynesboro office created by Stovall's departure. (*Id.*) Thus, transferring an ASAC such as Plaintiff to the Waynesboro office filled a legitimate "business need." (*Id.*) The reasons offered by Defendants satisfy their burden under this phase of the *McDonnell Dougla*s framework.

### 3. Pretext

Because the Defendants have met their burden to produce legitimate, non-discriminatory reasons for Plaintiff's transfer, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143 (2000)). At this stage, the burden to demonstrate pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). A "plaintiff may establish pretext by proving that the defendant's explanation for an employment decision is 'unworthy of credence' or that the defendant's explanation is false." *Anderson v. Westinghouse Savannah River Co.,* 406 F.3d 248, 269 (4th Cir. 2005) (quoting *Reeves*, 530 U.S. at 147)). However, "the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not *compel* judgment for the plaintiff." *Reeves*, 530 U.S. at 146. Rather, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* at 147. Thus,"[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id*. In the end, though, the plaintiff "bears the ultimate burden of persuasion." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

In order to show pretext, Plaintiff argues that: (1) the timing of the transfer was suspicious, and (2) the justification given for the transfer was not applied to transfer other, similarly situated individuals. Plaintiff's argument that the timing of Stovall's transfer out of Waynesboro — which justified Plaintiff's own transfer — was suspicious is well taken. Stovall expressed surprise at the abrupt timing of the transfer. (Dkt. 187-7 at 41). Further, the transfer

was ordered at 6:00 a.m. the morning immediately following a meeting in Charlottesville between Holcomb and Supinger. (Dkt. 187-8 at 73). Despite the fact that Stovall had previously requested the transfer, he believed that the transfer had something to do with tensions in Lynchburg and the meeting with Holcomb and Supinger in Charlottesville. (*Id.* at 72–74).

Plaintiff also validly argues that the nepotism policy justification for his transfer was pretextual because it was not applied to other related individuals. Plaintiff's transfer was only done in the "spirit" of the nepotism policy. Thus, Plaintiff adequately established that similarly situated individuals existed when he produced evidence of other couples whose working situations could be considered in violation of the "spirit" of the policy, but who were not transferred as Plaintiff was.[9] The nepotism policy also did not dictate Supinger's transfer, but merely recommended it.[10] Plaintiff thus successfully raises the inference of pretext by demonstrating that he was transferred on the basis of a policy that did not strictly apply to him and that had not been applied in the same manner to similarly situated individuals.

This conclusion, however is only sufficient to *permit* the factfinder to draw the inference of unlawful discrimination. *See Reeves*, 530 U.S. at 146–147; *Hicks*, 509 U.S. at 511. Absolutely no evidence in the record supports the inference that the transfer was due to racial discrimination over Plaintiff's bi-racial marriage. Plaintiff himself could not articulate why his transfer was not

---

[9]     Supinger identified numerous pairs of related individuals who worked "side-by-side," were "in the same building" or "same location," or were in situations where one supervised the other. (*See* dkts. 184-1 ¶5; 191-10 ¶¶10-18).

[10]     Supinger and his wife were grandfathered in under the policy because they began working in the same office prior to its effectuation in 2005. (*See* dkt. 188-1 ("A DMV employee who is currently employed with a family member in a situation that is . . . prohibited under this policy shall be allowed to remain in his/her current position.")). Similarly, the specific provision that justified Plaintiff's transfer covers only individuals being hired or transferred into a position with a relative, but not individuals who already work together. (*Id.*) Finally, that same provision only "recommends" transfer, as compared to other provisions that "prohibit" certain working arrangements. (*Id.)*

merely suspicious in general, but actually pretext for racial discrimination. (*See* dkt. 184-2 at 10–13). Plaintiff's own evidence, in fact, supports a different inference — that plaintiff was transferred because of something that occurred the previous day in a meeting with Holcomb in Charlottesville. (*See* dkts. 184-3 at ECF 2–3 ("I find it suspicious that this transfer happens the very next morning after I spoke to you about Jennifer Dawson."); 187-8 at 73–74); s*ee Reeves*, 530 U.S. at 148 ("For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision . . . ."). Further, the fact that Plaintiff and his wife had worked in the same location for many years makes it extremely unlikely that the DMV would suddenly decide to discriminate against Plaintiff on the basis of his bi-racial marriage rather than in reaction to something that occurred at a meeting the previous day.

The proximity of the transfer to a contentious conversation with Commissioner Holcomb may indeed be suspicious, but the record establishes that the conversation had nothing to do with Plaintiff's wife or marriage. While the offered reasons could have been pretext for something else, there is no evidence on the record to even create a slight inference that the reasons were pretext for racial discrimination. Plaintiff has failed to present evidence from which a reasonable factfinder could infer that unlawful racial discrimination occurred.

### c. Count II – Title VII Retaliation

Plaintiff alleges a Title VII retaliation claim stemming from his termination. Plaintiff argues that he was terminated in retaliation for filing EEOC charges and internal grievances with the DMV.

### i. *Prima Facie* Case

A *prima facie* case of Title VII retaliation requires the plaintiff to allege that: (1) he engaged in protected activity; (2) his employer took a materially adverse action against him; and (3) but for the protected activity, the asserted adverse action would not have occurred. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015).

The parties do not appear to contest whether Plaintiff has made out a *prima facie* case, and the Court will assume that Plaintiff has for the purposes of this opinion. Instead, the parties dispute whether Defendants' proffered non-discriminatory reasons are pretextual.[11]

### ii.  Valid, Non-Discriminatory Reasons

Defendants may rebut Plaintiff's *prima facie* case by producing a legitimate and non-retaliatory basis for Plaintiff's termination. *See Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013). Defendants have produced several non-retaliatory reasons, evidenced by five disciplinary written notices given to Plaintiff prior to his dismissal. Defendants accurately summarize the allegations in these written notices as the following justifications for dismissal: "(1) Supinger acted improperly by needlessly forcing a hasty criminal investigation against Dawson despite his well-established animus against her; (2) forwarded to his subordinates a demeaning mock EWP of Dawson that encapsulated his belief that she suffered from mental problems; (3) accessed a coworker's confidential information without authorization in order to build his own grievance against DMV; (4) sent an email to subordinates that accused Dawson of spreading 'falsehoods' in an attempt to ostracize her further; and (5) sent emails designed specifically to 'get a rise out' of management." (Dkt. 182 at 13). These proffered non-discriminatory reasons, supported by the evidence on the record, are sufficient to rebut Plaintiff's

---

[11]     The causation standard at the *prima facie* case stage is different than that of the pretext stage. *Foster*, 787 F.3d at 251 ("[T]he burden for establishing causation at the *prima facie* stage is 'less onerous.'" (quoting *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir. 1989))).

*prima facie* case and shift the burden back to the Plaintiff to prove that these reasons were pretext for retaliation.

### iii. Pretext

At the pretext stage, Plaintiff must establish "both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct." *Foster*, 787 F.3d at 252 (quoting *Jiminez v. Mary Washington Coll.,* 57 F.3d 369, 378 (4th Cir. 1995)).  In evaluating whether a plaintiff can show that these reasons were pretextual, the Court is not called upon to judge "whether the reason was wise, fair, or even correct, ultimately." *Dugan v. Albemarle Cty. Sch. Bd.*, 293 F.3d 716, 722 (4th Cir. 2002). If the record shows Defendants "honestly believed" Plaintiff deserved to be discharged, then pretext is absent, even if Defendants were wrong or mistaken about the underlying facts. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217–18 (4th Cir. 2007). Further, the "real reason" must be a "but-for" cause of the adverse action. *See Foster*, 787 F.3d at 252.

Plaintiff first attempts to show pretext by attacking the legitimacy of the investigation done by Thomas Penny, Director of Fuels Tax for the DMV. This investigation produced much of the evidence contained in the written notices justifying his termination. Plaintiff argues that the presence of the investigation itself is evidence of pretext because it shows the Defendants were hunting for reasons to fire Plaintiff. Like in *Taylor v. Republic Servs., Inc.*, 2013 U.S. Dist. LEXIS 132281 (E.D. Va. Sept. 16, 2013), Plaintiff argues that Penny investigated him for bringing a complaint rather than investigating the complaint itself. However, this reasoning is not supported by the facts. Unlike in *Taylor*, the record demonstrates that Penny *did* investigate Supinger's complaints, although he may not have reached the conclusion that Supinger desired. (Dkts. 181-29, 181-30). However, during the course of his investigation into Dawson, Penny also

uncovered potential wrongdoing by Supinger and others at the Lynchburg CSC. (Dkt. 181-64 ¶ 6). The fact that a DMV investigation did not find evidence of Dawson's threat but instead found evidence of Plaintiff's own wrongdoing does not amount to pretext.

Plaintiff also argues that the Penny investigation was biased. In support of this assertion, Plaintiff offers evidence that Penny (1) was controlled by the people he was supposed to be investigating, (2) at times turned off his recording device, (3) unfairly focused his investigation on Plaintiff's wrongdoing rather than Dawson's. None of these arguments are persuasive. The mere fact that that Penny was ultimately supervised by Hill is insufficient evidence of bias, particularly when his investigations are thoroughly documented and when Plaintiff does not deny the veracity of the interview transcripts or emails it uncovered. The evidence of Penny turning off his recording device, quite simply, is hearsay and will not be considered by the Court on a motion for summary judgment.[12] Finally, as discussed above, Supinger's complaints were fully investigated by Penny. The fact that Supinger was also investigated as a result does not undermine that fact or make Penny's investigation biased. In sum, Plaintiff's attempts to inject uncertainty or bias into Penny's investigation are unsuccessful.

Plaintiff also attacks the written notices themselves, arguing summarily that they are not "legitimate." He alleges that the various written notices were either untrue or so untimely as to raise the inference of pretext.[13] He also argues that none of the conduct would have warranted

---

[12]     The cited exhibit consists notes by Stultz's Attorney, Dale Webb, describing assertions made by Hicks. (*See* dkt. 187-23). Because Hicks' assertions are being used for the truth of the matter asserted, they are hearsay.

[13]     Plaintiff largely fails to argue that the written notices were not proper grounds for dismissal in his own briefings. Instead, he cites to lengthy passages of his own and Stultz's declarations. Defendants have largely responded to the arguments made by Stultz in his declaration.

termination even if it were true.[14] These allegations are supported primarily by declarations by Plaintiff and Stultz. Each of the written notices is considered in turn.

### 1. Supinger's Biased Investigation into Dawson

The first written notice alleges that Supinger failed to "impartially discharge" his duties by investigating Dawson knowing that he had personal animus towards her, and by conducting the investigation in a biased manner. (Dkt. 181-24). Plaintiff argues that he was placed in an impossible position: he was tasked with investigating Dawson by Stultz, while simultaneously being forbidden from contacting Dawson because of their rocky relationship. (*See* dkt. 187-2 ¶ 108). He could not have recused himself from the investigation, he argues, because policy dictated that he investigate the incident immediately. (*See* dkts. 187 at 3 n.2; 187-2 ¶¶ 106–07, 117). Supinger also contends that the DMV officials acted inconsistently in how they punished Stultz and Supinger, punishing Stultz for ordering the investigation at all, while punishing Supinger for conducting it poorly. (See *dkt*. 187 at 13). Further, he argues that Hill knew he was assigned to the Dawson investigation, yet did not act to remove him. (*See* dkt. 187-2 ¶¶ 118-19).

---

[14] Plaintiff offers a declaration by Stultz in which he states that Plaintiff's infractions "would not have warranted disciplinary action of termination." (Dkt. 187-2, ¶26). However, the Court is not required to give this statement dispositive weight and deny summary judgment on the basis of a genuine issue of material fact. *See Guinness PLC v. Ward*, 955 F.2d 875, 901 (4th Cir. 1992) ("[M]ere placement . . . of conclusory allegations and speculative assertions into affidavits or declarations without further legitimate support clearly does not suffice."). Further, Stultz's opinion on whether Supinger's conduct justified termination is not the relevant inquiry. *Dugan v. Albemarle Cty. Sch. Bd.*, 293 F.3d 716, 722 (4th Cir. 2002) ("'[I]t is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's [adverse employment action].'" (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998))). Allowing conclusory statements as to this issue would prevent courts in almost every case from pursuing the type of "particularized" inquiry that is required. *Connick*, 461 U.S. at 150. Thus, the Court may determine this issue on summary judgment despite Stultz's statement.

These arguments, even if taken as true, do not make the written notice unjustified. The primary charge in the written notice is that Plaintiff acted partially in attempting to conduct an investigation of a coworker towards whom he had personal animus. That he was constrained from interviewing Dawson is evidence in support of the fact that he should not have undertaken the assignment or should have asked to be removed from it. Similarly, it is perfectly consistent to punish Stultz for ordering Supinger to conduct the investigation, while punishing Supinger for failing to recuse himself and conducting it in a biased manner. Finally, Hill's failure to remove Supinger does not excuse Supinger's own conduct, particularly when Supinger had much greater knowledge of his potential bias towards Dawson than did Hill.

Additionally, Plaintiff's evidence does not address another fault in his conduct, that he used his investigation to air his own unrelated grievances. For instance, in a report supposedly about Dawson's alleged assault, Plaintiff found cause to mention: (1) Dawson's criticism of his management style, (2) his belief that he would be disciplined for assisting Wootten in bringing charges, (3) his belief that obstruction of justice was ordered by his superiors, (4) his transfer to Hampton, and (5) his belief that he was being retaliated against for filing the Hotline complaint, among other inappropriate topics. (*See* dkt. 181-17 at 26–31).

Overall, Plaintiff's arguments do nothing to detract from the fact that he investigated a coworker, knowing he had substantial negative history with her that would prevent him from carrying out his duties in an impartial manner, and resulting in a biased report that referenced numerous unrelated grievances. Plaintiff has not raised the inference that terminating him for such an offense was pretextual.

## 2. "Joke" Employee Work Profile for Dawson

The second written notice relates to Supinger's circulation of a "joke" EWP for Dawson in which he added the job requirement of "mental stability" and additional duties of making coffee and cleaning the office. (Dkt. 181-25). Plaintiff argues that the written notice is pretextual because it was not timely. That is, the conduct occurred years prior, but only became subject to discipline after he engaged in various protected activities. Further, he argues that he was already punished for the incident when it actually occurred, and the written notice was seeking to resurrect already-resolved wrongdoing as a pretext for retaliation.

Again, the facts do not support Plaintiff's argument. While the email may have been sent in October 2011, DMV officials did not become aware of the email until October 2012 (dkt. 187-1 ¶ 10), and the investigation into Plaintiff's conduct — wherein Plaintiff admitted the EWP was a "joke" — was not concluded until February 2013 (dkt. 181-38 at 127). Thus, the gap between the wrongful conduct and punishment is explained by a lack of timely information to the DMV. Plaintiff also does not cite sufficient evidence for the proposition that he was already punished for sending the joke EWP. Plaintiff cites to an allegation letter sent in April of 2012 that accused him of harassment towards Dawson. (Dkt. 187-1 ¶ 10). However, the letter contains no mention of the joke EWP and was issued several months after the email was sent. (Dkt. 187-17). Further, Plaintiff himself alleges that Defendants only became aware of the EWP when he revealed it to the DMV in October of 2012 — months after the allegation letter. (Dkt. 187-1 ¶ 10). The evidence does not support an inference that this written notice was pretextual.

### 3.  Offensive Email Regarding Dawson

In regards to an upcoming meeting between Dawson and Hill, Supinger sent an email to several subordinates stating that "[o]ne can only imagine what falsehoods [Dawson] is planning to relay to [Hill]" and that he "thought each of you should know what we are up against." (Dkt.

181-11). Plaintiff contends that he had already been disciplined by Stultz for sending the email, and thus further punishment was unwarranted and pretextual. (Dkt. 187-2 ¶ 90). However, during Penny's investigation, Stultz denied ever having seen the email, thus precluding the possibility of him disciplining Supinger on the basis of it. (Dkt. 192-6 at 209–10). Because the written notice was based on information from Penny's investigation, it was reasonable for Hill to conclude that Supinger had not been disciplined by Stultz for the email. Thus, Plaintiff has not raised an inference of pretext with regard to this written notice.

### 4. "Psych-Ops" Emails

Believing that management was reviewing his emails, Plaintiff admitted to sending emails that he considered "pysch-ops" in order to "get a rise out of" management. (Dkt. 181-38 at 136). Plaintiff's only defense to this charge was that he was not being truthful to Penny when he made his statement and was acting out on his frustration after being "antagonized" by Penny during the interview process. (Dkt. 187-2 ¶ 12). Plaintiff's subjective belief in the truth of the statements is irrelevant, as the inquiry here is into what the relevant decisionmakers reasonably believed. Plaintiff's superiors could have believed the truth of his own self-incriminating statement because there was no evidence at the time to undercut its veracity.

### 5. Viewing of Confidential Information

The final written notice relates to Supinger's alleged viewing of another DMV's employee's performance review. (Dkt. 181-44). There is a factual issue in contention as to whether Supinger was able to view the performance evaluation from just glancing at the packet of papers, rather than searching through it.[15] The parties agree that Supinger had the duty of

---

[15] Plaintiff also argues that he had permission from Donald Boswell, Director of the DMV Law Enforcement Division, to use the performance review. (Dkt. 187 at 3–4 n.2). Plaintiff's evidence of this comes from the fact that Boswell considered the other performance score in

opening mail to determine where it should go, so Supinger would not have committed a wrongdoing had the information been visible from a cursory examination of the first page.

Whether Supinger actually wrongfully viewed confidential information is not the inquiry; rather, the Court must instead ask whether the relevant decisionmaker (Stone) "honestly believed" that he did. *See Holland*, 487 F.3d at 217–18. Stone's personal observation of the layout of the packet gave him a sufficient basis on which to reasonably believe that Plaintiff had improperly viewed confidential information. (*See* dkt. 181-43). Stone then spoke with Supinger about the alleged wrongdoing and filed a formal report stating his belief that Supinger had viewed confidential information. (*Id.*) Such actions are highly consistent with the notion that Stone authored the written notice because he honestly believed Supinger had viewed confidential information improperly. Further, there is no evidence supporting Plaintiff's alternative explanation — that Stone terminated Supinger because of Supinger's grievances — because the record lacks information showing that Stone was aware of Plaintiff's grievances or EEOC charges except for the grievance containing the confidential information. (Dkt. 181-35 ¶ 3).

In order for this written notice to be pretext for retaliation, a factfinder must infer that Stone decided to terminate Plaintiff because he filed a grievance challenging his performance review, rather than because that grievance was based on the confidential information of a coworker that Stone believed Supinger had lied about obtaining. Further, the factfinder must infer that Stone's subsequent conversation with Supinger and the memorandum regarding the confidential information were insincere ruses designed to disguise Stone's true retaliatory

---

reviewing Plaintiff's grievance. (Dkt. 187-1, ¶12). However, Plaintiff's declaration does not assert that Boswell knew of how Plaintiff obtained the information, which was the alleged wrongdoing here. (*Id.*) Thus, Plaintiff's evidence does not support his assertion that he had permission from Boswell to engage in the wrongful conduct alleged in the written notice.

motivation. The Court does not find that such inferences are reasonable and holds that this written notice was not pretextual.

### iv. Conclusion

The Court will grant Defendants' motion for summary judgment on the ground that Plaintiff has not carried his burden under the pretext stage of the *McDonnell Douglas* framework. Defendants have offered five, well-documented reasons for Plaintiff's termination. These alleged wrongdoings were timely acted upon following an investigation into Plaintiff's conduct, and the investigation itself was spurred by the troubling Dawson-Wootten incident that occurred outside of Defendants' control. Rather than believing the straightforward explanation that Plaintiff was terminated as a result of the information discovered in the investigation, Plaintiff asks a factfinder to infer that he was terminated in retaliation for a series of grievances which dated back years.

Plaintiff, in attempting to rebut Defendants' offered explanations, has failed to present evidence overcoming the relevant standard of whether the relevant decisionmakers "honestly believed" that Plaintiff engaged in the specified conduct that was worthy of termination. *See Holland*, 487 F.3d at 217–18. Instead, Plaintiff has merely offered ineffectual argument – unsupported by substantial evidence – theorizing why the notices might be pretextual. He has failed, however, to offer evidence either creating the inference of pretext or suggesting that Plaintiff was terminated because of his filing of grievances. Based on the available record, a reasonable factfinder would hold that the relevant decisionmakers here honestly believed that Plaintiff should be terminated for his wrongdoings described in the written notices. Thus, Plaintiff has failed to show that Defendants' proffered reasons were pretext for retaliation, and Defendants' motion as to Count II will be granted.

### d. Count III – First Amendment Retaliation

Plaintiff brings a claim under 42 U.S.C. § 1983 alleging that Defendants terminated his employment in retaliation for his exercise of protected First Amendment rights. The Court concludes that the Defendants against whom Plaintiff has brought this claim — Holcomb, Hill, Thorpe, Boswell and Penny — are entitled to qualified immunity.[16]

### i. Scope of Complaint

As an initial matter, Defendants argue that Plaintiff has improperly alleged for the first time on summary judgment that Plaintiff spoke to the PBA and to Senator Deeds regarding the STARS divisions and reorganization. Defendants argue that because this speech was not mentioned in the complaint, it cannot be part of Plaintiff's speech considered in his First Amendment retaliation claim. After a review of the record, the Court concludes that Defendant is correct with respect to the PBA meeting, but not with respect to the Deeds meeting.

"[I]t is well established that a plaintiff may not raise new claims after discovery has begun without amending his complaint." *U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010); *see also Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 562 (4th Cir. 2008). Further, courts have rejected Plaintiff's notion that a claim should be permitted so long as it was discussed during discovery and thus did not prejudice the other side. *See Hexion Specialty Chemicals, Inc. v. Oak-Bark Corp.*, No. 7:09-CV-105-D, 2011 WL 4527382, at *10 (E.D.N.C. Sept. 28, 2011). Instead, after the court-ordered time period for amending the complaint expires, new claims may be added

---

[16] Plaintiff's motion for summary judgment also asserts this claim against the Commonwealth of Virginia and the DMV. However, this Court has already held that Plaintiff has conceded his First Amendment retaliation claim against these two Defendants. (*See* dkts. 81 at 18 n.12; 35 at 14). Thus, they will not be considered here.

only for "good cause," which turns primarily on the "diligence of the moving party."[17] *See*

*Montgomery v. Anne Arundel County,* 182 F. App'x 156, 162 (4th Cir. 2006). Such diligence is

absent here because Plaintiff certainly had knowledge of the existence and content of his own

speech at the time he filed his amended complaint. His failure to relay his knowledge of those

conversations in his complaint because he did not yet realize they were legally relevant does not

demonstrate good cause. Therefore, to the extent Plaintiff's claims were not included in his

complaint, they cannot be considered here.

The complaint itself makes no mention of the PBA meeting or Sean McGowan, the

individual at the PBA with whom they met. Plaintiff's attempt to add it here mirrors the

circumstances in *Owens* and *Barclay White*, where the plaintiffs attempted to add additional

claims under existing legal theories, relying on facts that were added only after discovery had

begun. Plaintiff will not be permitted to argue that he has a First Amendment retaliation claim

based on his speech during a meeting with the PBA that went completely unmentioned in his

complaint.

Although the Deeds meeting is mentioned, the complaint specifically states that the

parties discussed: (1) Dawson's behavior, (2) Defendants' lack of response to address Dawson,

and (3) retaliation and discrimination against Supinger and others. (*See* dkt. 133 ¶ 103). Despite

specifying the topics discussed with Deeds, Plaintiff makes no mention of the reorganization

issue. Plaintiff's complaint fails entirely to mention "STARS" or "radio" and only mentions the

reorganization with respect to Plaintiff's reassignment to the Hampton Division. (*Id.* ¶ 67–70).

However, Plaintiff provided sufficient notice of his speech regarding DMV reorganization at the

---

[17]     Here, the July 16, 2015 Pretrial Order specified that "[e]xcept for good cause shown, any
[motions to amend pleadings] must be filed no later than 45 days from the date of this order."
(Dkt. 7, ¶24).

meeting with Senator Deeds to satisfy the pleading requirements of Rule 8. In his complaint, Plaintiff stated both that he met with Senator Deeds and that, generally, he discussed "fraud and waste of state resources, mismanagement of resources at DMV, threats to public safety, and obstruction of justice" with elected officials. (*Id.* ¶ 169). Because Plaintiff asserted a First Amendment claim based on his conversation with Senator Deeds and generally alluded to the subject matter, he will not be barred from presenting a more specific argument at summary judgment based on the same conversation. It is sufficient that Defendants were on notice that Plaintiff believed he was retaliated against for speaking with Senator Deeds, in the meeting specified in the complaint, and on matters of fraud and waste.

### ii. Merits

The Fourth Circuit recently addressed the standard applicable to First Amendment retaliation claims brought by government workers:

> It is well established that government workers do "not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of [their] employment." *City of San Diego v. Roe,* 543 U.S. 77, 80 (2004) (per curiam). Underlying this rule is both the government employee's interest, "as a citizen, in commenting upon matters of public concern," *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568 (1968), and the community's interest in hearing those employees' "informed opinions on important public issues." *Roe*, 543 U.S. at 82. Nonetheless, "a governmental employer may impose certain restraints on the speech of its employees ... that would be unconstitutional if applied to the general public." *Id.* at 80. A public agency has an interest "in promoting the efficiency of the public services it performs through its employees," *Pickering*, 391 U.S. at 568, and allowing all employment decisions to be subject to "intrusive oversight by the judiciary in the name of the First Amendment" would compromise an agency's operations. *Connick v. Myers,* 461 U.S. 138, 146 (1983).
>
> When a government employee claims that he was disciplined because of his speech, we use a three-prong test to determine if the employee's rights under the First Amendment were violated. *McVey v. Stacy,* 157 F.3d 271, 277 (4th Cir. 1998). The first prong asks whether the employee "was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest." *Id.* This prong can in turn be divided into two inquiries: whether the speech was made as a citizen or pursuant to the employee's duties, *Garcetti,* 547 U.S. at 421,

and whether the content of the speech addressed "a matter of interest to the community" rather than "complaints over internal office affairs." *Connick,* 461 U.S. at 149. If the speech was made as a citizen and addressed a matter of public concern, the second prong of the test requires a court to balance the interest of the employee in speaking freely with the interest of the government in providing efficient services. *Pickering*, 391 U.S. at 568. The *Pickering* balancing test demands a "particularized" inquiry into the facts of a specific case. *Connick*, 461 U.S. at 150. If a court determines that the employee's interest outweighed the government employer's interest, the third prong requires a determination that the employee's speech caused the disciplinary action. *McVey*, 157 F.3d at 277-78. The first two prongs of this test are questions of law, while the third is a factual inquiry. *Brooks v. Arthur*, 685 F.3d 367, 371 (4th Cir. 2012).

*Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017). Because the first two prongs of the *Pickering* test are questions of law, the Court may first determine whether Defendants are entitled to qualified immunity under either prong. *Id*. Defendants are entitled to qualified immunity unless Plaintiff demonstrates that "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The Court has "discretion [to] decid[e] which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, the analysis will begin and end with whether the right was "clearly established" at the time of the alleged violation. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Ashcroft*, 563 U.S. at 735. (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2090 (2012)). Both the "particular right" and the "manner in which the right applies to the actions of the official" must be apparent. *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). "While a case directly on point is not required for a court to conclude that the law was clearly established, 'existing precedent must have placed the . . . constitutional question beyond debate.'" *Brickey v. Hall*, 828 F.3d 298, 304 (4th Cir. 2016) (quoting *Smith v. Gilchrist*, 749 F.3d 302, 307 (4th Cir. 2014)). In

other words, qualified immunity protects government officials when they act in legal "gray areas," but not when they transgress "bright lines" *Id.*; *Maciariello*, 973 F.2d at 298.

## 1. Public Concern

Speech by a government employee is a matter of public concern "when it involves an issue of social, political, or other interest to a community." *Kirby v. City Of Elizabeth City, N. Carolina*, 388 F.3d 440, 446 (4th Cir. 2004). Matters such as "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest" are not matters of public concern because they "are matters more immediately concerned with the self-interest of the speaker as employee." *Campbell v. Galloway*, 483 F.3d 258, 267 (4th Cir. 2007). Similarly, "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2011). In determining whether speech is a matter of public concern, courts should look to "content, form, and context of a given statement." *Connick*, 461 U.S. at 147–48.

The content of Plaintiff's speech may be divided into four categories: the manipulation of the investigation of his FWA Hotline complaint ("Hotline"); the reorganization of DMV law enforcement divisions to no longer mirror STARS boundaries ("Reorganization"); Dawson's troubling and potentially dangerous behavior in the Lynchburg CSC ("Dawson"); and obstruction of Commonwealth Attorney Kelly Osterbind's prosecution of Dawson for the bathroom incident ("Obstruction").

Plaintiff's Hotline complaints were aired in several meetings and emails. However some of Plaintiff's speech related only to the fact that the Hotline complaint failed to adequately investigate Dawson, or was that he was personally being retaliated against for filing the

complaint.[18] Such speech is not a matter of public concern because it only relates to an internal personnel dispute that only affects Plaintiff personally.

However, in the meeting with Senator Deeds, Supinger also expressed concerns that the Hotline process itself had been manipulated and was generally subject to manipulation. (*See* dkt. 184-1 ¶ 12). This aspect of Plaintiff's speech was not merely regarding a "personal grievance," but instead also related to fraud and a breach of the public trust within the upper ranks of a law enforcement agency. *See Cutts v. Peed*, 17 Fed. App'x. 132, 135 (4th Cir. 2001) (noting that statements involving "purported fraud" in a law enforcement agency "indisputably do constitute matters of public concern"); *Maciariello*, 973 F.2d at 300 (holding that "an allegation of evidence tampering by a high-ranking police officer is a matter in which the public should be interested"). It is clearly of public concern if, as Plaintiff alleged, the mechanism by which public fraud, waste and abuse is exposed is being manipulated to prevent wrongful acts from coming to light.

Plaintiff's speech regarding Reorganization was also as matter of public concern to the extent it related waste of taxpayer resources and police officer safety concerns arising from the misalignment with STARS districts. These concerns went beyond the mere personal inconvenience of being reassigned to a different division.[19] Specifically, Plaintiff's speech

---

[18] Supinger's conversation with Senator Newman and his first email to Governor McDonnell appear to only relate to the Hotline with respect to retaliation against him for filing the complaint. (*See* dkts. 184-22 at ECF 6 ("Supinger told Senator Newman that he had complained to the [Hotline] . . . [Stultz] chimed in that . . . management appeared to be aware of our involvement . . . and appeared to be retaliating."); 184-43 ("Currently, I have 2 active grievances with DMV regarding retaliation for reporting an incident to the Fraud, Waste and Abuse Hotline and misapplication of DMV policy.")). Thus, they are internal personnel issues and not matters of public concern.

[19] However Supinger's concerns regarding supervisory ratios are a thinly veiled attempt at framing his own reassignment as a public concern. *See Wootten*, 2016 WL 264959, at *6.

encompassed public concerns such as risks to police officer safety stemming from the changed radio protocol and waste of resources by failing to align with the existing STARS system. (*See* dkt. 188-12 ¶ 13). Plaintiff's speech on these matters occurred in the meeting with Senator Deeds and in his emails to various Virginia representatives other than Senator Newman.

Plaintiff's speech regarding Dawson, however, is not a matter of public concern. Much of his speech concerned her behavior around the office which made his personal work life unpleasant. Moreover, the "safety" concerns in which Plaintiff attempts to cloak his personal issues with Dawson also only relate to the happenings within his own workplace environment, which does not concern the general public. Plaintiff's speech regarding Dawson essentially amounts to complaints that his superiors were not adequately dealing with the disruptive behavior of a coworker. As such, they are not matters of public concern. *See Stultz v. Virginia, Dep't of Motor Vehicles*, No. 7:13CV00589, 2016 WL 4491714, at *18 n.6 (W.D. Va. Aug. 26, 2016) ("[T]he court is of the opinion that [Dawson] communications fall within the category of personal employee grievances related to conditions of employment, which do not constitute speech about matters of public concern that are protected by the First Amendment." (internal quotation marks omitted)); *see also Connick*, 461 U.S. at 147–48 (holding that "questions pertaining to the confidence and trust that Myers' coworkers possess in various supervisors" were not matters of public concern); *see id*. ("mere extensions" of a personal issue are not matters of public concern); *Goldstein v. Chestnut Ridge Volunteer Fire Co.,* 218 F.3d 337 (4th Cir. 2000) ("favoritism" towards another worker is not a matter of public concern).

Finally, Plaintiff's speech regarding Obstruction is a closer issue. Like his other concerns, his speech regarding obstruction of Kelly Osterbind's investigation ultimately stems from his

issues with Dawson. The question becomes, therefore, whether his speech expanded beyond a personal focus on Dawson to extend to other areas that *are* of public concern. Here, he also expressed concerns that high ranking members of the DMV were threatening a state prosecutor in order to protect a DMV employee. (Dkts. 184-43, 184-52, 184-53). Such concerns potentially elevate Plaintiff's speech beyond a mere personal grievance and into a matter of public concern.

The evidence on the record permits the Court to conclude that Plaintiff was speaking on a matter of public concern with respect to Obstruction. The mere fact that DMV officials agreed to initiate private contact with a Commonwealth's Attorney in order to influence her prosecution of one of their employees is of sufficient "interest to a community" to constitute a matter of public concern. *Kirby*, 388 F.3d at 446. Plaintiff's speech alleged fraud and abuse at the highest levels of a government agency and could constitute a matter of public concern. *See Cutts*, 17 Fed. App'x. at 135 (noting that statements involving "purported fraud" in a law enforcement agency "indisputably do constitute matters of public concern"); *Maciariello*, 973 F.2d at 300 (holding that "an allegation of evidence tampering by a high-ranking police officer is a matter in which the public should be interested"). Plaintiff's speech regarding Obstruction occurred in Plaintiff's latter three communications with Governor McDonnell.

The form of Plaintiff's speech does not alter the result. Although courts tend to find that speech is more likely to be public when it is made in a public forum such as a newspaper or on social media, a public forum is not required. *See Pickering,* 391 U.S. at 566 (newspaper); *Liverman v. City of Petersburg,* 844 F.3d 400, 409 (4th Cir. 2016) (online social media); *Robinson v. Balog*, 160 F.3d 183, 188 (4th Cir. 1998) (testimony at a public meeting). The Fourth Circuit has been clear that statements made in private may nonetheless be about matters of public concern. *Goldstein*, 218 F.3d at 354 ("Similarly, the fact that Goldstein did not make

his views publicly known does not, in any way, undermine the public concern encompassed in his speech."). Because Plaintiff took his concerns to various public officials, it is more likely that he was speaking on a "issue of social, political, or other interest to a community." *Campbell*, 483 F.3d at 267; *Cromer v. Brown*, 88 F.3d 1315, 1326 (4th Cir. 1996) (rejecting the view that "that exposing serious government misconduct to the news media is protected, but exposing that same misconduct to the Governor's Office, as in this case, by definition is not."). Although Plaintiff also took his concerns regarding Dawson to public officials, the form of speech does not alter the fact that the underlying content of that speech was about an internal personnel dispute.

Finally, the context of Plaintiff's speech reinforces the conclusions above. Supinger's complaints must be viewed in the context of his ongoing disputes with Dawson and his superiors. This background makes it more likely that Plaintiff's speech concerns this long-running personal grievance, and only permits the conclusion that his speech was of a public concern when it clearly goes beyond that personal squabble. The context provided by responses from Senator Newman also makes it clear that Newman viewed Plaintiff's concerns regarding Dawson as personal. (*See* dkts. 184-22 at ECF 6; 184-42 at ECF 2–3 (both describing Supinger's speech on Dawson as relating to "personnel" issues)).

Accordingly, considering the evidence in the light most favorable to Plaintiff, it was clearly established to Defendants that Plaintiff spoke on matters of public concern in the following instances: (1) his conversation with Senator Deeds regarding the Hotline and Reorganization; (2) his emails to various delegates discussing Reorganization; and (3) his communications with Governor McDonnell regarding Obstruction. Although there are indications that his speech was uninformed or an outgrowth of personal grievances, such considerations factor into the weight that Defendants could have reasonably given Plaintiff's

speech, but not whether the speech itself was on matters of public concern. *See, e.g. Crouse*, 848 F.3d at 586.

## 2. Balancing Test

The second step in analyzing Plaintiff's First Amendment retaliation claim is "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. In doing so, the Court must consider "the context of the employee's speech, including the employee's role in the government agency, and the extent to which it disrupts the operation and mission of the agency." *McVey*, 157 F.3d at 278. "The public's interest in hearing the employee's speech also weighs in the balance." *Brickey*, 828 F.3d at 304. Of particular relevance to this case, police entities have a uniquely strong interest in maintaining orderly operations because they are "paramilitary," such that "discipline is demanded, and freedom must be correspondingly denied." *Maciariello*, 973 F.2d at 300. Finally, courts "do not require the public employer to prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was 'reasonably to be apprehended.'" *Id*. (quoting *Jurgensen v. Fairfax Cty.*, 745 F.2d 868, 879 (4th Cir. 1984)).

## 1. Defendants' interest

Defendants have an interest in restricting Plaintiff's speech to maintain hierarchical decisionmaking structure within their organization, maintain morale, and prevent disruption. By speaking out on the Reorganization issue, Plaintiff went outside of the chain of command in order to reverse an organizational decision with which he disagreed. Defendants could reasonably have feared that his speech would undermine the decision they had made for the organization by spreading misleading accounts about the effect of the Reorganization to

individuals with the power to affect that decision. *See Grutzmacher v. Howard Cty.*, No. 15-2066, -- F.3d -- , 2017 WL 1049473, at *10 (4th Cir. Mar. 20, 2017) ("[W]e observe that the record is rife with observations of how Plaintiff's Facebook activity . . . disregarded and upset the chain of command upon which the Department relies."); *Crouse*, 848 F.3d at 587 ("What happened here would undermine the hierarchical structure that even the most admirably collaborative institutions maintain."); *Ober v. Evanko*, 80 F. App'x 196, 201 (3d Cir. 2003) (no protected speech when police officer went "outside the chain of command"); *Leonard v. Fields*, 791 F. Supp. 143, 144 (W.D. Va. 1992) (no protected speech where police officer "disregarded the chain of command"). In fact, Plaintiff's speech with Senator Deeds went beyond mere potential for disruption as it eventually led to Senator Deeds proposing legislation, based primarily on Plaintiff's biased portrayal of the STARS situation,  that would have undone the decision of the DMV management. (Dkt. 192-9).

Further, Supinger's superiors could have reasonably believed that his accusations of fraud and attempts to circumvent the normal organizational hierarchy in his other speech would affect their ability to manage the organization. Supinger sought to undo DMV management's decisions that Dawson (1) was properly investigated by the Hotline and (2) did not commit criminal assault against Wooten. Based only on speculative evidence, he framed his disagreement with the outcome of these proceedings regarding Dawson by accusing his superiors of fraud and corruption, sometimes in the presence of his subordinates and other members of the DMV law enforcement. Such conduct was sufficient to permit Defendants to reasonably believe that disruption would have occurred as a result. *See McVey*, 157 F.3d at 278; *Brickey*, 828 F.3d at 305 ("Because speech accusing a superior officer of incompetence or malfeasance goes to the heart of the superior's authority, Hall could reasonably have believed that Brickey's comments would

undermine his authority in the eyes of the public and within the police department."); *Grutzmacher*, 2017 WL 1049473 at *8 ("Plaintiff's . . . activity interfered with and impaired Department operations and discipline as well as working relationships within the Department."). Defendants' interest was also heightened here because Supinger was involved in the type of "paramilitary" organization in which camaraderie and internal discipline are essential. *Brickey*, 828 F.3d at 304 (quoting *Maciariello*, 973 F.2d at 300).

### 2. Plaintiff and Public's Interest[20]

The main factor in favor of Plaintiff's speech is that it potentially relates to substantial interests of police officer safety and fraud among high-ranking public officials. Plaintiff also strenuously argues that his speech was truthful and thus should be accorded more weight. Similarly, Plaintiff argues that his speech should not be considered a personal grievance because he first brought his concerns to superiors rather than launch a "personal investigation." *See Maciariello*, 973 F.2d at 300 ("If personal investigations were the usual way for an officer to check out suspicious activities of a fellow officer, the effect on efficiency and morale could be very disrupting, and the effectiveness of the police force might deteriorate.").

Defendants primarily argue that because much of Plaintiff's speech was false or speculative, it should be accorded less weight. While this is true, Plaintiff's speech is still entitled to some weight because of the public concerns it encompasses; namely the safety of police officers and fraud at the highest levels of the DMV.

### 3. Balancing

---

[20] Plaintiff does not explicitly argue under this structure and rather seeks to rebut Defendants' claims regarding disruption. However, in accordance with the applicable standards and precedent, an inquiry into both sides' interests is the correct way to structure the analysis. *See, e.g. Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 355 (4th Cir. 2000).

.

Each side presents credible interests to be considered in the *Pickering* balancing test. Plaintiff's speech related to important police officer safety and fraud considerations, while Defendant has presented evidence as to how the speech was disruptive by harming morale and undermining the decisions of his superiors. However, several factors serve to lessen Plaintiff's interest and heighten Defendants'.

First, Plaintiff's speech was not well-informed or always accurate. *See Crouse*, 848 F.3d at 586 (Finding a lessened interest where the plaintiffs "were not providing a particularly informed opinion"); *Roe*, 543 U.S. at 82 ("The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it."). Plaintiff largely lacked credible evidence to support his claims, and instead presented conclusions based on limited facts and that were ultimately premised on layers of assumptions colored by his own bias.

With regard to Reorganization, for instance, Plaintiff represented that the DMV was going to withdraw from the STARS system, thus wasting resources already invested in the system and putting officer lives at risk. (*See, e.g.*, 184-44; *see* 187-1 ¶ 18). Uncontested facts on the record, however, show that the DMV still planned on using the STARS system and that Bolton, the Director of STARS, had opined that the DMV's solution of switching radio channels was feasible and "no cost," albeit "high risk." (See dkts. 181-5, 181-6, 192-11). Thus, Plaintiff's speech on the matter was uninformed and misleading.

Plaintiff's speech regarding the Hotline was similarly uninformed. Plaintiff has not presented evidence that he had personal knowledge of specific acts that would constitute fraud at the time he opined on the Hotline issue. Instead, the evidence only shows that Plaintiff knew that the investigation had concluded that Dawson was not a threat, that the Hotline generally did not handle safety investigations, and that Hill was potentially in a supervisory role over those

individuals conducting the investigation. (Dkt. 184-1 ¶¶ 13, 17, 19). From those meager facts, he inferred fraud and manipulation of the Hotline on the part of Hill. However, the record reveals that Hill was not in a position to supervise the investigation. (Dkt. 188-70 at 136–37). Further, Tim Sadler of the DSIA — an agency entirely separate from the DMV and its chain of command — has stated that he would not have considered the actions taken by the Hotline investigators to be improper, much less fraudulent and manipulative. (Dkt. 188-7 at 39).

Finally, Plaintiff's speech regarding Obstruction presents perhaps the most egregious instance of speculation. Based only on hearsay, Plaintiff wrote the Governor to accuse his superiors of the crime of obstruction of justice. (*See* dkt. 187 at 17–18 ("Osterbind specifically told Hicks who told Supinger . . . .")). Specifically, Plaintiff shared his uninformed beliefs that Hill had asked Osterbind to enter a "Nolle Prosequi," that Hill had made demeaning remarks to Osterbind when she refused, and that Hill's actions "move towards (if they have not already) violating 18.2-460 (Obstructing Justice)." (Dkt. 184-52). However Osterbind has stated that Plaintiff's aforementioned assertions about the conversation are untrue and that nothing inappropriate happened in the conversation in question. (Dkt. 181-20). For this speech, like his other, Plaintiff's interest in uninformed and misleading speech is lessened, while the DMV's interest in preventing it is heightened.

Plaintiff's interest is also lessened by the fact that Defendants could have reasonably regarded his speech as a mere extension of his personal issues with Dawson and his management. *See Crouse*, 848 F.3d at 586 (Holding that that because the defendant was "entitled to regard [plaintiffs'] speech as an outgrowth of their private dissatisfaction," the "burden of showing the predominance of the public's interest in continuing the efficient functioning of a public entity is lessened"); *Maciariello*, 973 F.2d at 300 ("However, Rowell and Maciarello's

deposition testimony clearly shows that personal animosity motivated them to undertake the secret investigation. This motivation detracts somewhat from their professed interest in exposing official corruption.").

All of Plaintiff's grievances are traceable to personal dissatisfaction, either with his coworker Jennifer Dawson or his reassignment. His speech regarding the Hotline and Obstruction were closely tied to incidents involving Dawson. His original Hotline complaint was about Dawson's conduct, and the Obstruction claim arose in connection to a prosecution of Dawson that he had helped Wootten create. These grievances also came only after some action had been taken against him personally, including dismissing his complaints that Dawson constituted a safety threat and reprimanding him for assisting in the prosecution of Dawson. His speech regarding Reorganization also had a clear connection to a personal issue, as it resulted in him being transferred to a DMV division far from his home near Lynchburg. Further, Supinger's oft-mentioned concern about the "supervisory ratio" could have reasonably been viewed as a personal apprehension about a decreased level of responsibility following his transfer. (*See, e.g.* dkts. 184-42; 184-48).

Plaintiff's actual speech on all these relevant topics contained references to personal problems associated with all his purportedly public complaints. (*See, e.g.* dkts. 184-42 ("As a result [of the Reorganization], my transfer to Waynesboro is no longer an issue because I am being transferred to Hampton which will now cause me to maintain two residences at huge financial burden on my family."); 184-43 ("Currently, I have 2 active grievances with DMV regarding retaliation for reporting an incident to the Fraud, Waste and Abuse Hotline and misapplication of DMV policy."); *id.* ("I am also as a witness in this criminal case and I am feeling threatened and intimidated by DMV management after all the things they said to my

supervisor.")). Further, virtually all of Plaintiff's communications mentioned associated personal issues in some form or another, even when they also contained other speech that could properly be considered matters of public concern. Given the substantial evidence of his personal enmity towards Dawson and dissatisfaction with his transfer, Defendants would have been justified in viewing his speech as an outgrowth of his personal grievances. As such, his speech would have been given less weight under the balancing test in the view of a reasonable official.

Even ignoring the fact that Plaintiff's speech could have been considered an outgrowth of personal issues by a reasonable official, the concerns raised by Plaintiff fall short of the type of important public concern that has tilted the balancing test towards the individual in other cases. *See Connick*, 461 U.S. at 152 ("We caution that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern."). For instance in *Goldstein*, the court held that the defendant "was required to make an extremely strong showing" in light of the fact that the plaintiff's speech "related specifically to the safety of the public." *Goldstein*, 218 F.3d at 355. Other cases have found the distinction between systematic and isolated problems relevant. *See Brooks*, 685 F.3d at 374 ("These highly individualized concerns stand in sharp contrast to the complaint in *Cromer*, which addressed department-wide procedures . . . .").

Plaintiff's speech on the Hotline and Obstruction issues relates to two isolated instances of suspected bias or fraud on the part of his superiors, and which have no direct connection to public safety. Although they still must be granted some weight, these are not the type of interests that can be overcome only by an "extremely strong showing" from Defendants. *See Goldstein*, 218 F.3d at 355.

Though the Reorganization issue relates to a systemic concern, it also has indicia that it should not be given significant weight in the balancing test. Unlike *Goldstein's* allegations of poorly trained firefighters who put the general public in danger, Plaintiff's safety concern only extends to the narrow swathe of the population that is DMV law enforcement. This is also not the type of instance where Plaintiff was acting as a "whistleblower" exposing hidden government wrongdoing. (Dkt. 187 at 21). The DMV's reorganization plan was out in the open, and it had consulted on its proposed solution to the STARS issue with members of other government agencies. Plaintiff's concerns amounted to his personal opinion that his organization's public decision was the wrong one. *Connick*, 461 U.S., at 148 ("Indeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo."). Therefore, a reasonable official would have given it less importance than speech exposing hidden and objective wrongdoing.

Defendants' interest in maintaining order and camaraderie is heightened here where Plaintiff worked at a law enforcement agency. *See Crouse*, 848 F.3d at 586 ("Most critically, Chief Caldwell viewed what happened here as a threat to his ability to manage the police department. We have noted that, as paramilitary organizations, 'greater latitude is afforded to police department officials in dealing with dissension in their ranks.'" (quoting *Maciariello*, 973 F.2d at 300)). The government's interest is also greater because Plaintiff occupied a supervisory role, where he could have a greater impact on unit cohesion and could thus be held to a higher standard. *See Grutzmacher*, 2017 WL 1049473 at *9 (holding that the plaintiff's speech "significantly conflicted with Plaintiff's responsibilities as battalion chief" such that "Plaintiff's managerial position also weighs in the [defendant's] favor").

In weighing these heightened and lessened interests, the facts presented leave no question that disruption here was "reasonably to be apprehended" by Defendants. *Maciariello*, 973 F.2d at 300. With respect to the Reorganization speech, a government entity could hardly operate if every employee were permitted to circumvent the chain of command and lobby elected officials to reverse organizational decisions. There is evidence of this disruption on the record in the form of legislation that would negatively affect DMV leaders' goals and Defendants expressed concerns that Supinger's speech would result in the removal of law enforcement authority from the DMV. (*See* dkts. 192-9 at 72-73, 76; 133-5; 181-46 at 23). To a lesser but still significant extent, organizational cohesion becomes untenable when a manager is permitted to accuse his superiors of fraud and deceit, sometimes in the presence of other employees, and based on hearsay and speculation. These conclusions apply with greater force where the speaker presents a biased or incomplete picture of the situation and presents little information other than his own opinion. Again, all of these concerns are heightened in the context of a law enforcement unit where camaraderie and internal discipline are essential.

Given Plaintiff's lessened interests and Defendants' heightened ones, it would have not been "clearly established" to the Defendants that they were violating the First Amendment in restricting Plaintiff's speech. Defendants could have reasonably believed that preventing Plaintiff's disruptive speech was necessary for maintaining the efficient operation of the DMV's law enforcement, in conformity with existing case law on First Amendment retaliation. Thus, Defendants are entitled to qualified immunity and their motion for summary judgment will be granted as to Count III.

### e. Count IV – Procedural Due Process

Plaintiff has brought a claim under 42 U.S.C. § 1983 that Defendants denied him due process in violation of the Fifth and Fourteenth Amendments. The parties concur that the Procedural Due Process claim against Defendant Penny should be dismissed because Penny had no involvement in the deprivation of this right. Defendants have also brought up some damages issues related to the deprivation. The Court will decline to address the damages issue until the Fourth Circuit reaches a decision on this claim currently before it on appeal, particularly because the parties did not brief the merits of this issue.[21]

### f. Count V – Supervisory Liability

Count V alleges a cause of action under 42 U.S.C. § 1983 against Holcomb for supervisory liability related to the alleged violations of Plaintiff's rights under the First, Fifth, and Fourteenth Amendments (Counts III and IV). The question of whether there was a Due Process violation under Count IV is currently on appeal to the Fourth Circuit to determine whether the Defendants were entitled to qualified immunity. Therefore, to the extent Defendants move for summary judgment as to this issue, it is denied without prejudice.

The Court will grant Defendants' motion as to First Amendment supervisory liability on the basis of qualified immunity. To demonstrate that Holcomb lacked qualified immunity for Count V, Plaintiff must show that: (1) it was "clearly established" at the time of Hill and Stone's conduct that Holcomb could be held liable under § 1983 for constitutional violations committed by them; (2) it was "clearly established" at the time Holcomb was supervising Hill and Stone that their termination of Plaintiff was an unconstitutional violation of his First Amendment rights; and (3) a reasonable person in Holcomb's position would have known that his actions were

---

[21]     Defendants also ask the Court for leave to file additional briefing once the Fourth Circuit issues a ruling. Once the Fourth Circuit has ruled, the Court will issue an appropriate order detailing any further briefing that may be required.

unlawful. *See Shaw*, 13 F.3d at 801. The Court has already concluded that it was not clearly established that Defendants were violating Plaintiff's First Amendment rights. Thus, the second prong cannot be met and Holcomb is entitled to qualified immunity as to the First Amendment portion of Count V.

## IV.    Conclusion

Plaintiff's Title VII racial discrimination claim (Count I) will be dismissed because his EEOC charge was not timely filed. Plaintiff's 28 U.S.C. § 1983 racial discrimination claim (Count VI) will be dismissed because Plaintiff has not carried his burden of demonstrating that the Defendants' legitimate ref'asons for his transfer were pretext for racial discrimination. Plaintiff's Title VII retaliation claim (Count II) will also be dismissed because Plaintiff has not carried his burden of proving that Defendants' facially legitimate reasons for his termination were pretext for retaliation for his filing of EEOC charges and internal grievances. Plaintiff's First Amendment retaliation claim (Count III) will be dismissed because Defendants are entitled to qualified immunity. Defendants' motion as to supervisory liability (Count V) will be granted in part because it is premised on a constitutional violation of the First Amendment. However, it will not be granted as to the Due Process claim as that issue is currently on appeal. Plaintiff's Procedural Due Process claim (Count IV) against Penny will be dismissed, upon consent of the parties. However, the remainder of the claim will be unaffected by this motion because the qualified immunity determination for that claim is claim is currently on interlocutory appeal.

An appropriate Order will issue.

Entered this 26th day of April, 2017

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE